No. 74,877

STATE OF KANSAS, *Appellee,* v. GREGORY BAACKE, *Appellant.*

932 P.2d 396

Opinion filed January 24, 1997.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the brief for appellant.

*William L. Navis*, county attorney, argued the cause, and *Brian V. Grace*, assistant county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is a direct appeal pursuant to K.S.A. 22-3601(b)(1) from jury convictions of first-degree felony murder and felony theft. Gregory Baacke asserts the following trial errors: (1) The trial court erred in admitting certain testimony; (2) the trial court erred in allowing the State to make an impermissible argument during closing remarks; (3) the trial court erred in refusing to give lesser included offense instructions; (4) the trial court erred in failing to suppress Baacke's confessions as the result of an illegal seizure; and (5) the trial court erred in giving a PIK Crim. 3d 52.02 jury instruction.

On September 23, 1994, Gladys Knedlik was stabbed and shot at her rural home in Republic County, Kansas. After Baacke was apprehended with his friend Matthew Keen in Knedlik's car in Huntington, Arkansas, he admitted to killing Knedlik and taking her car. Baacke and Keen were charged with Knedlik's murder and tried separately. Baacke defended on grounds of insanity, diminished capacity, and voluntary intoxication.

*Factual Background*

Baacke and Keen lived near Amherst, Nebraska. On September 22, 1994, they stole a car from a neighbor's home, packed some of their possessions, and then drove south and east on country roads intending to drive to Florida. Past midnight, the car got stuck on

a muddy road in Republic County, Kansas. After spending the night in the car, they took their belongings and approached the farmhouse of 79-year-old Gladys Knedlik.

Baacke first went alone to the house and looked around. He then returned to the road where Matt waited, and they talked. Carrying a copper-handled knife, Baacke went back to the home and spoke with Knedlik at the front door. Baacke told Knedlik that his car was stuck and asked for help. As Knedlik turned to use the phone to call for help, Baacke stabbed and slashed her in the back 21 times. Keen then joined Baacke and shot Knedlik in the back with a Beretta 20-gauge sawed-off shotgun.

Baacke and Keen placed Knedlik's body against the front door and covered it with an army blanket and a throw rug. They searched Knedlik's home, took a tub of change containing about $15, then left in Knedlik's white 1984 Monte Carlo. Before leaving, they locked the front, back, and garage doors and closed all the draperies.

Baacke and Keen continued driving south and east on back roads, crossing into Arkansas. They reached the small town of Huntington and stopped in a city park to spend the night. Around 3 a.m. on September 24, 1994, John Efurd, the Huntington police chief, passed by the park and noticed the vehicle. Efurd made contact with Keen, who was behind the steering wheel, and asked for identification. Efurd noticed another man sleeping in the back seat and some items with a red substance on them. After Keen was unable to produce identification, Efurd asked him to accompany him to the patrol unit to check on his identity. Keen provided the required information, and Efurd discovered that Keen's license was suspended. When asked if any weapons, drugs, or contraband were in the vehicle, Keen replied, "There is a loaded, sawed-off shotgun in the back with my buddy, sir." After Efurd's backup recovered the loaded Beretta, Efurd placed Baacke and Keen under arrest for possessing a prohibited weapon.

Baacke and Keen both consented to a search of the vehicle. Among the items discovered were numerous knives, including the copper-handled knife, some drug paraphernalia, maps of Kansas

and Oklahoma, a red gas can, and blood-stained clothes. Baacke was also wearing clothes stained with blood at the time of his arrest.

Baacke and Keen were taken to a detention facility in Fort Smith, Arkansas, and separated for interrogation. Baacke waived his rights and agreed to an interview. When Efurd told him he had already interviewed Keen, Baacke said, "I might as well go ahead and tell you, yes, I did, I was involved in stealing a vehicle and killing a lady, sir." Baacke demonstrated to Efurd how he had killed Knedlik and said he had used the copper-handled knife. Baacke said he thought she was going to call the police, so he killed her. Baacke stated, "I just went off on her." He also told Efurd, "I just want to get this behind me, I want to get this over with." Efurd testified at trial that Baacke did not appear to be under the influence of drugs or alcohol at the time of the interview and that he appeared calm, but anxious about something.

Baacke was interviewed by another local investigator and admitted stealing a car in Nebraska, which got stuck in the mud in Republic County, Kansas. He said they obtained another vehicle from a nearby farmhouse, but he did not wish to discuss what occurred there.

After being notified of the location of Knedlik's vehicle, authorities in Republic County, Kansas, found Knedlik's body. Knedlik had been stabbed and slashed 21 times in the head, neck, and back and was shot in the lower back by a shotgun blast. Any one of numerous injuries could have caused her death. The police also discovered two sets of footprints leading from an abandoned car to Knedlik's home. One set matched the boots worn by Baacke.

KBI agent Bill Pettijohn went to Arkansas to interview Baacke and Keen. He tape-recorded his interview of Baacke. The tape, along with a transcription, was admitted into evidence. During the interview, Baacke admitted to stabbing Knedlik and taking her car, but denied shooting her. He said that after she turned to make the call, he stepped into the house and "from then on I kind of lost control of where I was and what not."

Baacke was charged with first-degree felony murder. The complaint was amended twice to charge Baacke with premeditated first-degree murder or alternatively felony murder along with fel-

ony theft. Baacke gave notice he intended to use the insanity defense.

The defense arranged for Baacke to be interviewed by Dr. Robert Schulman, a clinical and forensic psychologist. Dr. Schulman examined Baacke on December 21, 1994, for about 4 hours and provided a report to the State. The report stated Baacke was a psychotic individual with paranoid-type schizophrenia, all in remission, but was in need of long-term psychiatric care. The State sent Baacke to Larned State Security Hospital, where he underwent evaluation for over a month and a half.

Baacke did not testify at trial, but did offer evidence of his mental history. Witnesses testified that as a child Baacke had been transferred back and forth from the homes of his parents and grandparents and never had a stable home life. Baacke's father's family had a history of suicide and his mother had abused drugs and alcohol.

In 1986, when Baacke was about 11 years old, his stepmother took him to a psychologist because of his continuing fecal incontinence, a condition referred to as encopresis. This psychologist recommended "intensive, long-term treatment," which Baacke did not receive, though his encopresis resolved itself in a few years. In 1992, when Baacke was about 16 years old, his stepmother again took him to a psychologist because of difficulties managing his behavior. This psychologist recommended continued family therapy.

Baacke did not receive this therapy because he moved back to Nebraska, near his mother. Baacke then became friends with Keen and began frequent use of alcohol, marijuana, methamphetamines, LSD, freon, and butane. Dr. Schulman and a substance abuse counselor both testified that Baacke had a substance abuse problem.

Dr. Schulman also testified at trial that Baacke did not understand the difference between right and wrong when he killed Knedlik and that he had a defect in his thought process. Although Baacke told him he and Keen had planned to rob people on the way to Florida, Dr. Schulman stated, "I don't think that ever was crystallized to the point of it being a plan. This was more a random kind of behavior."

The State's witnesses, however, testified that in their opinion and in the opinion of the staff at Larned State Security Hospital, Baacke was sane at the time of the crime. They found no indication he suffered from schizophrenia or any type of psychotic disorder.

The trial court instructed the jury on the elements of premeditated first-degree murder, felony murder, and felony theft. The trial court also instructed on the lesser included offense of second-degree murder and gave instructions on insanity, diminished capacity, and voluntary intoxication.

The jury found Baacke guilty of both counts, but could only agree on the combined theories of premeditation and felony murder. Baacke was sentenced to life imprisonment plus 14 months. Baacke appeals. We affirm.

*Admission of testimony*

Baacke asserts the trial court denied him a fair trial by permitting the State to elicit certain testimony during redirect examination of KBI agent Pettijohn and cross-examination of Dr. Schulman. In *State v. Haddock,* 257 Kan. 964, 978, 897 P.2d 152 (1995), we stated our standard of review:

"The admission or exclusion of evidence, subject to exclusionary rules, is within the trial court's discretion. *State v. Coleman,* 253 Kan. 335, 344, 856 P.2d 121 (1993). Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *State v. Baker,* 255 Kan. 680 Syl. ¶ 9, 877 P.2d 946 (1994)."

See *State v. Coleman,* 253 Kan. 335, 344, 856 P.2d 121 (1993).

While cross-examining Pettijohn about his interrogation of Baacke, defense counsel asked Pettijohn whether he knew an element of theft is intent and that elements of first-degree murder include intent and premeditation. When Pettijohn stated he would have had to ask the county attorney, counsel asked, "You're telling me you didn't know what you were supposed to investigate, how to investigate this crime when you got down there?"

Counsel then established that although Pettijohn asked Baacke about events of the murder, Baacke never indicated in his statement that he approached Knedlik's home with the intent to steal or to kill. Pettijohn also acknowledged that he never asked Baacke

if he had attempted to conceal the murder of Knedlik. Defense counsel further asked, "So this was a conversation between two people that if there was more information that could have been obtained, you would have asked those questions, isn't that correct?"

On redirect, the State attempted to establish why Pettijohn never asked Baacke whether he intended to steal Knedlik's car or whether he intended to kill her before he approached the house. Baacke objects to the following line of questioning:

"Q. Counsel asked you some questions, a number of questions about intent, whether you asked—whether you asked whether his client had intended to do a particular act or not. Do you recall those questions?

"A. Yes, I do.

"Q. In regard to your interview with the defendant, did the defendant himself in that interview tell you at what point that he killed Mrs. Knedlik?

"A. Yes, sir.

"Q. Did it have anything to do with Mrs. Knedlik turning to make a phone call?

"A. That's correct.

"Q. Did you feel that actions like that in the interview spoke to the matter of intent?

"Mr. Blackwell: I'm going to object, Judge. That's clearly an issue for the jury and not for Mr. Pettijohn to come to the conclusion of. He took an interview, he had a question, my client had a—a response. He can't now say what's in my client's mind, Judge. This clearly goes to the province of the jury.

"Mr. Navis: It isn't a question of what is in his client's mind. I think the question was directed to Mr. Pettijohn as to why he did or didn't do anything. If he has reason for that, I think he should be able to share those with the jury.

"The Court: Well, Number 1, I think the—the door's been opened to this general line of questioning, and I think it's appropriate Redirect, and Number 2, I think Officer Pettijohn can testify as to what he, in his—what was in his mind, so to speak.

. . . .

"Q. Well, let me rephrase and direct your attention, first, to the question that counsel had raised in terms of matter of intent. Do you recall that?

"A. Yes.

"Q. And in the interview, did Mr. Baacke give you an answer concerning the point at which he had attacked Mrs. Knedlik?

"A. That's correct.

"Q. All right. At what point in the interview and in the confrontation with her did he attack her with the knife?

"A. When she picked up the phone to make a call, it appeared to him to be ready to make a call.

"Q. Did you believe at that time, Officer, that that said something about his intent?

"A. That's correct.

"Q. In the course of the interview, counsel was asking you a number of questions about the intent that you didn't ask. Do you recall that?

"A. Yes.

"Q. I didn't recall you asking any questions about whether the defendant was trying to protect himself from Mrs. Knedlik.

"A. The only thing that was—I asked if she had a gun during one portion.

"Q. What was his response?

"A. That she did not.

"Q. Did you feel based upon that answer that there is reason to inquire into the defendant's intent in regard to self-defense?

"A. No, sir.

"Q. Did you feel like, based upon the responses to the defendant's questions in regard to matters why he was in the home, it was apparent to you that he needed transportation?

"A. That was what my understanding was, yes, sir.

. . . .

"Q. Counsel asked you some questions concerning whether the defendant intended to conceal his crime. Do you recall that line of questioning?

"A. Yes, I do.

"Q. Did you also have some information that you were already aware of at the time you interviewed him in regard to whether or not he had concealed the crime.

"A. That's correct.

. . . .

"Q. Had you had an opportunity at that point in time to be aware of the fact that within the car the defendant was found there were a number of weapons?

"A. That's correct.

. . . .

"Q. And did that information have something to do with the nature of the questioning that you were conducting of the defendant in the course of that taped interview?

"A. Yes, it did.

. . . .

"Q. Does all of this evidence that you just described have and form a basis for the nature of your questioning, the nature of your questions to the defendant at the time of the interview?

"A. Yes, it did."

On further redirect, the State asked, "In your experience as a law enforcement agent investigating a homicide, do you consider

a body then concealed at the scene to be of some evidentiary value?"

Baacke cites *State v. Steadman,* 253 Kan. 297, 302-04, 855 P.2d 919 (1993), to show the admission of such testimony deprived him of a fair trial. In *Steadman,* police witnesses had been permitted to testify that in their opinion the defendant was guilty of the crime and exhibited the pressure felt by a guilty person, other persons were not guilty of the crime, and there was probable cause to issue a search warrant. In reversing and remanding for a new trial, we held such testimony invaded the province of the jury and this error deprived the defendant of his right to a fair trial. 253 Kan. at 304.

*Steadman* is readily distinguishable. Here, the questioning Baacke objects to explained why Pettijohn did not pursue various questions in his interrogation of Baacke, which the defense had clearly implied was either because Pettijohn was incompetent or because Pettijohn knew Baacke had no intent to steal or kill. Pettijohn's testimony provided an explanation as to his own actions; it did not attempt to explain or opine anything about Baacke's actions or mental state. Pettijohn never stated that, in his opinion, Baacke was guilty or had intended to steal from or kill Knedlik. He testified that certain actions and evidence were informative of Baacke's intent, but did not state what he believed that intent to be.

Additionally, and equally important, in the present case, the defense clearly opened up the line of testimony elicited by the State. We have stated: " 'When the defendant opens a subject on direct or cross-examination, the State may develop and explore various phases of that subject.' *State v. Chatmon,* 234 Kan. 197, 203, 671 P.2d 531 (1983)." *State v. Hall,* 246 Kan. 728, 743, 793 P.2d 737 (1990). This testimony did not invade the province of the jury. The trial court did not abuse its discretion in allowing its admission.

Baacke also claims the trial court should not have permitted the State to cross-examine his expert witness about the facts of the case and what a reasonable person would believe about them. Dr. Schulman testified that, in his opinion, Baacke did not know the difference between right and wrong at the time of the killing. On cross-examination, the following testimony was elicited:

"Q. Are you aware that after Mrs. Knedlik was killed, her body was covered with rugs?

"A. I don't remember being aware of that.

"Q. Isn't it a fact, sir, that attempts to conceal a crime can be considered evidence that the person who committed it knew that it was wrong?    :

"Mr. Blackwell: I'm going to object, Judge, that is not a psychiatric/psychological conclusion, that's a conclusion for the jury to be making, and once again, goes back to this issue of concealment when that is not—that's another issue for this jury.

"The Court: Well, the objection is overruled. . . .

. . . .

"A. Not necessarily."

On recross, the State asked Dr. Schulman whether a reasonable person would think that because Baacke and Keen took all their belongings with them when they left the car stuck in the mud, they did not intend to return. The State also asked whether a reasonable person would assume that because Baacke and Keen did rob somebody after saying they had a plan to rob somebody, that is what they intended to do and that was their plan. This question came after Dr. Schulman admitted Baacke said they had a plan to rob people on the way to Florida, but denied that Baacke actually had such a plan. Baacke further complains that the State was permitted to ask Dr. Schulman if he was a reasonable man and whether a defendant is more likely to rely on the insanity defense when the crime is murder rather than theft.

The cases Baacke cites in support of his argument, *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), and *State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985), are clearly not on point. These cases disallowed expert opinion testimony which passes upon the credibility of witnesses or the weight of disputed evidence. Baacke classifies the State's questions as improper expert opinion testimony and alleges that the State's questions went to the ultimate issue. However, Dr. Schulman had already been permitted to give an opinion as to the ultimate issue of sanity. The State's questioning simply tested the reasonableness of his opinion. It was nothing more than proper cross-examination.

In *State v. Osby*, 246 Kan. 621, 631, 793 P.2d 243 (1990), we stated: "[T]he extent of cross-examination for purposes of impeach-

ment lies within the sound discretion of the trial court and, absent proof of clear abuse, the exercise of that discretion will not constitute prejudicial error. *State v. Brown*, 235 Kan. 688, 689, 681 P.2d 1071 (1984)."

The State did not impermissibly or unfairly question this witness. Dr. Schulman testified that Baacke was not sane when he committed the murder of Knedlik. The State was entitled to demonstrate Dr. Schulman's knowledge of the evidence in the case and to ask whether his opinion of Baacke's sanity would change upon hearing the additional facts. Allowance of this testimony was not unreasonable. The trial court did not abuse its discretion.

*Closing argument*

Baacke complains about the italicized comments made by the prosecutor during closing argument:

"You heard His Honor, just a few minutes ago, tell you that what premeditation means, is thinking it over ahead of time. He didn't say that you need to think about it for three months, he said you didn't have to plan the trip in Kearney, Nebraska. He said you had to think it over ahead of time, and that's what the evidence in the case shows. Okay. What did the defendant and his companion do immediately after killing Gladys and leaving her home here in Republic County, Kansas? Were they so confused that they didn't understand they were headed toward Florida? What did the defendant himself say? Always south, always east, headed toward Florida. And what happened, just as I told you on Monday, they travelled the rest of that day, he and his companion, and by that, by nightfall, *they were in Huntington, Arkansas, and where would we be, people, if John Efurd, hadn't have got that telephone call that night? Where would we be? You don't want to—or the defense doesn't want to attribute to this defendant the capabilities that he has shown in this case. If John Efurd hadn't of [sic] driven by that park that night, this defendant could have got that car to a parking garage in Little Rock or Memphis or done something with it, and did with it exactly what he did with Melvin Hadwiger's car. What would have traced him—[interrupted]*

. . . .

"*It is very important that the defendant receive credit, if you will, for what he was capable of doing at this date and time, and that's how close they came. He did it one time out here in regard to Mr. Hadwiger's car, and if they hadn't got caught in Arkansas, you need to ask yourself, what would have happened, and how close they came.* Chief Efurd testified and described to you . . . how he had contact with him. . . . Look at the facts in which he was arrested. The defendant was found sleeping soundly in the back of Gladys Knedlik's car. . . . This

young man is intelligent. . . . What was his demeanor and attitude at the time that John Efurd interviewed him?" (Emphasis added.)

Baacke claims these arguments denied him the right to a fair trial. He says the prosecutor was clearly appealing to the jury's fears as to what further crimes Baacke might have committed and was suggesting that if the jury did not convict him, he would harm others. He asserts the prosecution's question of "where would we be" could only divert the jury from the proper issue before it of whether Baacke had a mental condition which negated his intent to commit the crime.

Baacke relies on *State v. Zamora*, 247 Kan. 684, 803 P.2d 568 (1990), to demonstrate that this argument was impermissible. In *Zamora*, we held that the defendant was denied a fair trial when the prosecution made the following improper statement: " 'He has raped this victim once. If he is found not guilty, he will get away with it again.' " 247 Kan. at 689.

The State argues the plain meaning of the prosecutor's statement was to emphasize that Baacke was trying to get away, that this said something about his mental state, and that it was only a fluke that he got caught. Rather than implying that Baacke would have harmed others if he had not been caught or would harm others if not convicted, the State says the statement only reasonably implies that because Baacke knew to switch cars before, he could have done so again.

In *State v. Duke*, 256 Kan. 703, 718, 887 P.2d 110 (1994), we said:

"In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Improper remarks made by the prosecutor in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. *State v. Green*, 254 Kan. 669, 685, 867 P.2d 366 (1984)."

In *Duke*, we summarized what was permissible and what was improper during closing argument. We stated the prosecutor may draw reasonable inferences from the evidence, but may not comment upon facts outside the evidence. Counsel may make impassioned appeals to the jury, but should not inject issues broader than

the accused's guilt or innocence or make predictions about the consequences of the jury's verdict. 256 Kan. at 719-20.

The prosecutor's remarks could be interpreted to imply that because Baacke stole a car before by killing a person, he could have done so again. However, the primary intent of the statement more logically appears to demonstrate that Baacke did have the mental state to commit murder. The statements do not imply that Baacke will harm others if he is not convicted, especially when considered with the jury's awareness from a specific instruction that Baacke would be institutionalized if found not guilty by reason of insanity.

Although the prosecutor's closing argument might have been more pointed, his remarks did not deny Baacke a fair trial or prejudice the jury against him. The evidence against Baacke consisted of several admissions by him that he did, in fact, kill Knedlik. The question at trial was whether he possessed the requisite intent. The statements objected to were unlikely to make the jury more or less likely to find him insane, unless the jury drew the permissible inference that such behavior reflected upon Baacke's mental state and his ability to form the requisite intent. We find that the State's closing argument was not improper and Baacke is not entitled to a new trial.

*Lesser included offenses*

Although the trial court instructed the jury on the lesser included offense of intentional second-degree murder, Baacke claims the court erred in refusing to give requested instructions on reckless second-degree murder, voluntary manslaughter, and involuntary manslaughter.

Baacke correctly asserts that the trial court has a statutory duty to instruct the jury on lesser included offenses. K.S.A. 21-3107(3) states:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

The court has this duty regardless of whether the defendant requests the instruction at trial. *State v. Sanders*, 258 Kan. 409, 413, 904 P.2d 951 (1995).

However, we have also held that the duty to instruct only arises when there is evidence to reasonably support a conviction for the lesser offense. *State v. Pierce,* 260 Kan. 859, 865, 927 P.2d 929 (1996); *State v. Coleman,* 253 Kan. 335, 352, 856 P.2d 121 (1993). In *State v. Harris,* 259 Kan. 689, 702, 915 P.2d 758 (1996), we described when a trial court is required to give a lesser included instruction:

"We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense."

Baacke argues that he was entitled to instructions on both reckless second-degree murder and involuntary manslaughter. He claims the evidence supported his theory that Knedlik was killed in a reckless, but unintentional, manner. Baacke points to his extensive history of psychological and substance abuse problems and cites evidence that he may have been delusional or under the influence of drugs when the crime was committed. These factors, he asserts, may have so affected him that he was not aware of the consequences of his actions and could not have formed the intent to kill Knedlik.

The State argues that by its very definition, recklessness requires a realization or appreciation of the risk to others and a conscious disregard of that risk. See K.S.A. 21-3201(c). Because reckless conduct requires an awareness of the consequences of one's conduct, the State claims Baacke's purported mental state was inconsistent with recklessness. The State points out: "The defenses of insanity, diminished capacity and voluntary intoxication may excuse or negate criminal responsibility for an otherwise intentional act, but they do not transform the act itself into one of gross negligence or recklessness."

The evidence in this case clearly does not support a theory of recklessness. Baacke approached Knedlik's home carrying a knife and wearing gloves. He admitted to attacking her when she turned around. She was stabbed and slashed 21 times. "Intentionally" is defined as "conduct that is purposeful and willful and not acciden-

tal. Intentional includes the terms 'knowing' 'willful,' 'purposeful' and 'on purpose.' " PIK Crim. 3d 56.04. Knedlik was clearly killed in an intentional manner, and Baacke was not entitled to an instruction for either reckless second-degree murder or involuntary manslaughter.

Baacke also asserts that he was entitled to a voluntary manslaughter instruction. K.S.A. 21-3403 provides:

"Voluntary manslaughter is the intentional killing of a human being committed:

"(a) Upon a sudden quarrel or in the heat of passion; or

"(b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto."

Baacke does not argue that Knedlik was killed upon a sudden quarrel or in the heat of passion, or that he believed he was justified in using force against Knedlik. Instead, he boldly argues that, although not included in the statute, subsection (a) under the common law includes killings committed intentionally, but without malice, due to a mental disease, defect, or intoxication.

Baacke maintains that K.S.A. 21-3102(1) permits us to recognize a common-law definition of voluntary manslaughter as recognized in the very old case of *State v. Rumble,* 81 Kan. 16, 105 Pac. 1 (1909). K.S.A. 21-3102(1) states:

"No conduct constitutes a crime against the state of Kansas unless it is made criminal in this code or in another statute of this state, but where a crime is denounced by any statute of this state, but not defined, the definition of such crime at common law shall be applied."

Baacke's argument is not well taken. The criminal code clearly defines what constitutes voluntary manslaughter. As such, any prior common-law definitions may not be applied by this court. Further, in several similar cases, where defendants argued they either possessed mental defects or were intoxicated, we have stated that defendants were not entitled to voluntary manslaughter instructions. See *State v. Bailey,* 256 Kan. 872, 885-89, 889 P.2d 738 (1995); *State v. Hamons,* 248 Kan. 51, 63, 805 P.2d 6 (1991); *State v. Guebara,* 236 Kan. 791, 797, 696 P.2d 381 (1985); *State v. Jackson,* 226 Kan. 302, 307, 597 P.2d 255 (1979), *cert. denied* 445 U.S. 952

(1980). No voluntary manslaughter instruction should have been given.

*Confession*

At trial, Baacke moved to suppress his statements to the police because he claimed they resulted from an illegal detention. The trial court held a hearing and made detailed findings in denying Baacke's motion. The court pointed out that this was not a stop of a moving vehicle and that the time between police chief Efurd's first contact with the vehicle's occupants and their ultimate arrest was a short period, less than 10 minutes. Citing *State v. McKeown,* 249 Kan. 506, 509, 819 P.2d 644 (1991), and *State v. Marks,* 226 Kan. 704, 707-08, 602 P.2d 1344 (1979), the court ruled that the vehicle was not unlawfully detained and the evidence was not subject to suppression.

We said in *State v. Webber,* 260 Kan. 263, 274-75, 918 P.2d 609 (1996): "In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment."

Baacke first claims that Efurd's initial contact with their vehicle was an illegal detention unsupported by reasonable suspicion of any criminal activity. Yet, in *State v. McKeown,* 249 Kan. at 509, we reiterated:

"An officer who does not have reasonable suspicion to justify a *Terry* stop may, however, approach an individual on the street for investigative purposes. . . . The officer can ask the individual's name and request identification but cannot force the individual to answer. The individual is free to leave."

We also ruled in *State v. Marks,* 226 Kan. at 710, that an officer's request for identification of an individual in a parked car was not a stop or detention and that "the police officer had the right to approach the defendant in the car for the purpose of questioning defendant in the course of a criminal investigation."

Here, Efurd had two reasons for approaching the vehicle occupied by Baacke and Keen. City ordinances barred parking on the grass of the park and established a curfew for persons under

the age of 18. Efurd was entitled to approach and ask for identification.

Baacke next argues that Keen had no ability to terminate the interview because his car was blocked in a wooded area by Efurd's vehicle, parked 15 feet away. Nothing in the record suggests that Keen attempted to terminate the encounter with Efurd or asked to leave, or that Efurd's vehicle actually prevented his departure. These circumstances would support a finding that a reasonable person would have felt free to leave under the test articulated in *Florida v. Royer,* 460 U.S. 491, 502, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). Further, the record indicates both Keen and Baacke appeared very willing to comply with every request of the officers.

Baacke finally asserts that the removal of Keen to Efurd's patrol vehicle to check on his identity exceeded the scope of the initial contact. However, it was not unreasonable for Efurd to request Keen to accompany him, which Keen willingly did, under the circumstances. Baacke claims that once Keen told Efurd his age, no further records check should have been done and any further detention was unlawful. Considering the curfew, the illegal parking, and Keen's failure to produce a valid driver's license, further investigation was justified.

Substantial competent evidence supports the trial court's finding that the officers acted reasonably under the circumstances. The facts do not indicate that the police unreasonably detained Baacke or that they exceeded the limits of a permissible investigation. As a result, we conclude that the statements Baacke subsequently gave to the police were not the product of an illegal seizure.

*PIK Crim. 3d 52.02 instruction*

Although Baacke concedes that no objection was raised at trial, he now asserts that jury instruction No. 7, the unaltered PIK Crim. 3d 52.02 instruction, was clearly erroneous on two grounds. He first claims that the use of the words "not guilty" in the first portion of the instruction, rather than a statement that the defendant is presumed "innocent," is clearly erroneous because it dilutes the presumption of innocence guaranteed by K.S.A. 21-3109. Second, he argues that the phrase "claims made by the State" instead of

"elements of the offense" is clearly erroneous because it leads to confusion regarding the burden of proof.

We recently rejected identical arguments in *State v. Pierce*, 260 Kan. at 867-71. Therefore, Baacke's argument that the instruction was clearly erroneous must fail. His further contentions that the phrasing of the insanity, voluntary intoxication, and diminished capacity instructions compounded the error and that the court erred in failing to give an affirmative defense burden of proof instruction also have no merit.

Affirmed.