No. 95,621

STATE OF KANSAS, *Appellee,* v. BOBBY BRUCE WHITE, *Appellant.*

(161 P.3d 208)

Opinion filed June 22, 2007.

*Shawn E. Minihan,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*James R. Watts,* assistant county attorney, argued the cause, and *Paul J. Morrison,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: After this court reversed Bobby Bruce White's first-degree premeditated murder conviction and remanded for a new trial in *State v. White,* 279 Kan. 326, 109 P.3d 1199 (2005), he was

again convicted of the same crime. He again appeals his conviction. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the prosecutor commit misconduct requiring reversal? No.
2. Did the district court err in allowing a narrative response from witness Relph? No.
3. Did the district court err in instructing the jury on the issue of mental disease or defect? No.
4. Did the district court err in failing to instruct the jury on the lesser included offense of voluntary manslaughter? No.

Accordingly, we affirm the district court and conviction.

## FACTS

On March 27, 2002, Bobby Bruce White drove from his home in Great Bend to the Wal-Mart store in Augusta. Once inside, he walked directly to the electronics department where his son-in-law, Aaron Ruboyianes, was working. He killed Aaron with three shots from a handgun.

After White was charged with first-degree premeditated murder, he filed notice pursuant to K.S.A. 22-3219 of his intent to rely upon the defense of lack of mental state or mental capacity. Dr. Marilyn Hutchinson later performed a psychological evaluation of White. Among other things, she concluded that White suffered from major depression. The district court disallowed her testimony, holding that the defense failed to relate White's mental disease or defect to the lack of the mental element required in the offenses charged.

A jury convicted White of first-degree premeditated murder. On appeal, this court determined that exclusion of Hutchinson's testimony violated his fundamental right to a trial and that the district court's failure to give an instruction on mental disease or defect was erroneous. As a result, the case was remanded for a new trial. 279 Kan. at 341, 345.

The retrial occurred in August 2005. The same basic defense was asserted: not guilty because of mental disease or defect that rendered White incapable of possessing the required criminal intent to commit the charged offenses.

The same basic facts were also established. In late 1998 or early 1999, White and his wife became guardians of their grandson, B.A.W., who was born in May 1996. In 2001, White accepted a job in Great Bend, Kansas. Although the Whites wanted B.A.W. to accompany them, his mother (Mother), who was now married to Aaron Ruboyianes, wanted him to stay in Augusta with her. Consequently, she moved to terminate her parents' guardianship in the district court.

The Whites visited Mother and Aaron's home in February 2002. Mother was gone at the time. Upon returning, she found Aaron upset and scared. According to a letter written by Aaron about the encounter, White told him: " 'You guys started this, and I'm gonna finish it once and for all,' " and " 'You guys don't know quite what you're getting into.' "

On March 25, 2002, the court terminated the Whites' guardianship and reinstated Mother's custody. The next day White left his home in Great Bend for work. He instead drove 2 hours to Augusta, withdrawing $500 in cash on the way. He later returned home to attend a dentist appointment.

The next day, March 27, White again made the 2-hour drive to Augusta. He entered Wal-Mart, Aaron's place of employment, and without warning, shot the unarmed Aaron three times, killing him. He was apprehended in the store parking lot.

After his arrest, White gave a *Mirandized* statement to Captain Bruce Relph of the Augusta Department of Safety. He told Relph that he shot Aaron to protect his grandson. White's videotaped statement was played to the jury.

Dr. Hutchinson testified for the defense. According to her, White obsessed about protecting B.A.W. and was trying to protect him the day of the shooting. She diagnosed him as having a personality disorder not otherwise specified with dependent, depressive, narcissistic, borderline, and passive-aggressive traits, along with major depression. Dr. Hutchinson opined that his personality

disorder impaired his sense of reality. Based upon White's personality disorder, she thought it was possible that he could have driven 2 hours to Augusta and then shot Aaron without knowing what he was doing. Essentially, she testified that White suffered from a personality disorder that impaired his ability to form the requisite intent to commit murder.

The State presented rebuttal testimony from Dr. Bradley Grinage, a forensic psychiatrist. He opined that White, at the time of the shooting, did not "suffer from mental disease or defect sufficient to interfere with his ability to form intention to commit the crime." Because this conclusion was different from his earlier opinion, and notice of his change had not been given to defense counsel or the court before his rebuttal, the court struck his entire testimony.

White was again convicted of premeditated first-degree murder.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1. *The prosecutor did not commit misconduct requiring reversal.*

White argues that the prosecutor committed misconduct requiring reversal by his: (1) intentionally withholding evidence that Dr. Grinage, prior to trial, had changed his opinion about White; (2) inappropriately attacking Dr. Hutchinson; and (3) eliciting a narrative response from Captain Relph. White's third contention of error will be analyzed in issue 2.

### Standard of Review

Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial

action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing cases).

In the second step of the two-step analysis, the appellate court considers three factors to determine whether a new trial should be granted:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 [inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial], have been met." *Tosh*, 278 Kan. 83, Syl. ¶ 2.

### 1. *Change in testimony*

White first argues that he was denied the right to a fair trial because the State failed to disclose that Dr. Grinage had changed his opinion of whether White suffered from mental disease or defect that negated his ability to form intent.

In June 2005, the State filed a motion on the admissibility of Dr. Grinage's testimony. In the motion, the State noted that Dr. Grinage was initially hired by defense counsel to evaluate White; however, the State wanted to call Dr. Grinage as a rebuttal witness.

At the motion hearing, White's attorney relied upon the report Dr. Grinage had prepared for the defense in asking the court to exclude his testimony:

"[W]e would object to the evidence coming in through Doctor Grinage on the grounds of relevance. *He is not able to make any firm determination as to whether Mr. White could form the intent or not in this case.* He, basically, joins Doctor Hutchinson's diagnosis of depression. But we don't believe there's anything relevant in his report, and we would object on those grounds." (Emphasis added.)

The district court determined that it would wait to see "how the evidence develops at trial" before ruling on the admissibility of Dr. Grinage's testimony.

In rebuttal to Dr. Hutchinson's trial testimony 5 months later that White suffered from a personality disorder that impaired his ability to form the requisite intent to commit murder, Dr. Grinage testified that White's prior defense counsel had initially contacted him to do an evaluation. The evaluation occurred in November 2002. After the examination, Dr. Grinage prepared a report for defense counsel.

Dr. Grinage then testified that White did not have a formal thought disorder. Specifically, he concluded that White did not, at the time of the alleged criminal conduct, suffer from mental disease or defect sufficient to interfere with his ability to form intent to commit the crime.

On cross-examination, Dr. Grinage admitted that at the time he had prepared his written report for defense counsel several years earlier, he had been unable to form an opinion as to whether White suffered from a mental disease or defect sufficient to render him incapable of forming the intent to premeditate. He testified that the change in his opinion occurred after he "re-reviewed the records, looked at the new information [from Dr. Hutchinson], and really investigated the question."

After the cross-examination, the district court called a bench conference and independently inquired as to why Dr. Grinage's testimony had changed from the report he had initially prepared. Dr. Grinage acknowledged that he had formed his revised opinion a week prior to trial. Evidence suggests he had informed the prosecutor that morning before trial. The court observed that the State should have advised defense counsel and the court of the change prior to trial. Defense counsel then moved to strike Dr. Grinage's testimony from the record and later moved for a mistrial.

After dismissing the jury for the day and hearing further argument on the matter, the next morning the judge determined that the State was not intentionally "sandbagging" the defense:

"I've already said that I'm not going to dismiss this case with prejudice, because I don't believe, frankly, that this was an intentional act by the prosecutor from the standpoint of intentionally sandbagging the defense. I think it was sandbagging, but I don't think that it was intentional. Sandbagging, as I understand it, is

turning in a handicap of 15 and showing up at the golf course and shooting par. And that's basically what happened here. But I don't think that it was intentional.

. . . .

"I don't think it was intentional misconduct. I just think it was waiting too late in the game to get the witness ready; not asking the right questions at the right time. I mean, one ought to know what that witness' testimony is going to be. And, apparently, the State didn't know until yesterday morning what that witness' testimony was going to be. Because if I understand what he had, he told the prosecutors yesterday for the first time."

Nevertheless, the court struck Dr. Grinage's entire testimony and instructed the jury not to consider it.

### 2. *Inappropriate attack on Dr. Hutchinson*

White also argues that the State used inappropriate means to attack Dr. Hutchinson and that the following exchange demonstrates the prosecutor's ill will:

"Q. [The State:] Ms. Hutchinson. Before we get started, about your report, I notice, as you testify, you take great pains to look at the jury to your right.
"A. [Dr. Hutchinson:] They're the ones that need to hear this, yes.
"Q. [The State:] Sure. It's something that a person whose—who practices a lot in testifying does?
    "[Defense Counsel:] Objection, Your Honor, argumentative.
    "THE COURT: Sustained."

### *Application of Tosh*

While objectionable, the prosecutor's remarks to Dr. Hutchinson do not alone constitute misconduct. The same cannot be said, however, about his failure to inform the court and defense counsel of Dr. Grinage's change in expert opinion concerning the heart of the defense.

Although misconduct occurred, reversal is not required unless the prosecutor's actions denied White a fair trial. See *Tosh*, 278 Kan. at 85. The record reveals that under the three factors constituting *Tosh*'s second step, White cannot make this showing.

First, the district court essentially determined that the prosecutor's conduct was not gross or flagrant or demonstrative of ill will when the court found there was no intentional misconduct. An appellate court does not reweigh the evidence and leaves the determination of factual questions to the trier of fact. See *State v.*

*Swanigan*, 279 Kan. 18, 23, 106 P.3d 292 (2005). Here, the district court had experience with these particular attorneys, from pretrial matters through the 5 days of trial before the Grinage episode arose. Accordingly, that court was in a better position to examine the issue of intent than this court because we have only a cold record to consider. Whether we might disagree with the district court is of no import, so long as its finding is supported by substantial competent evidence. The court's finding that the prosecutor had simply failed to timely prepare his witness and consequently had no intent to sandbag is one fair reading of the facts.

But the court's finding does not completely explain why—after the prosecutor's untimely preparation prevented him from learning of the changed opinion until the morning before trial—he then failed to notify the court and counsel before Grinage testified. The record contains no prosecutorial explanation, nor was any clear explanation provided to this court during oral arguments. This failure to disclose is troubling, particularly because the prosecutor should have known from the case's 3-year history that the expert's change directly attacked the heart of the defense. Accordingly, the prosecutor's failure could suggest deliberate concealment, which would indicate flagrancy and ill will. Nevertheless, the district court's general finding of "no intent to sandbag" is broad enough to prevent us from considering deliberate concealment as a possibility, much less forming this conclusion. Regardless of prosecutorial intent, this court strongly disapproves of such conduct by "a servant of the law and a representative of the people of Kansas." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000).

White adds to this misconduct stew the prosecutor's cross-examination of Dr. Hutchinson, asserting that his inference that she was a "hired gun" indicated ill will and was "highly detrimental to [White's] case." As mentioned, this conduct alone is merely objectionable. Even when considered in the misconduct calculus, White fails to specify how it harmed him.

Second, the evidence against White that he committed first-degree premeditated murder was of such direct and overwhelming nature that the prosecutorial misconduct likely had little weight in the jurors' minds. We initially observe that as many as nine wit-

nesses testified to the events in question. Among other things, testimony established that the month before shooting Aaron, White scared Aaron by threatening him: "You guys started this, and I'm gonna finish it once and for all." White skipped work and drove to Augusta from Great Bend the day before Aaron's murder, perhaps intending to shoot him then, but went home, only to return to Augusta to complete his plan the next day. White admitted to the police after his arrest that he shot Aaron to protect his grandson, a clear indication of intent.

We also observe that the misconduct likely had little weight in the jurors' minds because it did not deprive White of his defense: Dr. Hutchinson fully testified about her theory regarding mental disease or defect. Indeed, the jury convicted White of first-degree premeditated murder even after the fruits of the misconduct—Dr. Grinage's testimony—were completely stricken from the record and the jurors were admonished to disregard it.

Although prosecutorial misconduct occurred, reversal is not required. We hold that the harmlessness standards are satisfied from both K.S.A. 60-261 (not inconsistent with substantial justice) and *Chapman,* 386 U.S. 18 (conclude beyond a reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial).

*Mistrial*

White argues that regardless of whether the prosecutor's misconduct demonstrated flagrancy or ill will, it still made proceeding without injustice to him impossible, requiring declaration of a mistrial.

K.S.A. 22-3423(1) states:

"The trial court *may* terminate the trial and order a mistrial at any time that he finds termination is necessary because . . . (c) prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." (Emphasis added.)

As a general rule, a motion for a mistrial is reviewed under an abuse of discretion standard, and the party alleging the abuse bears the burden of proving that his or her substantial rights to a fair trial were prejudiced. *State v. Patton*, 280 Kan. 146, 181, 120 P.3d 760

(2005). This court examined a court's duty to declare a mistrial in *State v. Lewis*, 238 Kan. 94, 97, 708 P.2d 196 (1985):

"It is necessary when justice so requires to declare a mistrial where there is some fundamental failure of the proceeding. When an event of prejudicial misconduct, the damaging effect which cannot be removed by admonition and instruction, is presented to the jury, the trial judge must declare a mistrial."

White argues that *Lewis* is similar to the present case. There, the defendants were charged with aggravated robbery and aggravated battery for allegedly breaking into the victim's home where they beat and cut him. A central part of the defense was that no blood was found on the knife. The State's expert's written report given to the defense stated that no blood had been found. Before testifying, however, she notified the prosecutor that blood had been found. The State failed to inform the defense or the court of the change before she testified. The district court denied the mistrial motion but struck her testimony about the blood and admonished the jury to disregard it. This court held the district court abused its discretion when it refused to declare a mistrial, reversed the convictions, and remanded the case for a new trial, because the undisclosed testimony "destroyed the defense strategy." 238 Kan. at 97-99.

White also cites *State v. Campbell*, 29 Kan. App. 2d 50, 23 P.3d 176 (2001). There, the defendant was charged with second-degree intentional murder and six counts of endangering a child. Prior to trial, the State told defense counsel that it had no evidence concerning the time of the child's death, a central issue. However, at trial, the State presented evidence of time of death in its case in chief, thus undermining the defense's case. As a result, the Court of Appeals reversed and remanded for a new trial. 29 Kan. App. 2d at 62.

Both cases are distinguishable. In the present case, the misconduct did not destroy, or even change, the theory of defense. Dr. Hutchinson fully testified concerning White's personality disorder, which she opined prevented him from forming the requisite criminal intent for the offense. Had White's counsel previously known about Dr. Grinage's change, the essence of Dr. Hutchinson's tes-

timony would not have been materially different. Further, defense counsel cross-examined Dr. Grinage and pointed out to the jury the change in his opinion. See *State v. Dixon*, 279 Kan. 563, 593-95, 112 P.3d 883 (2005) (State expert's modified opinion that was not disclosed to defense counsel did not change defense strategy; change in testimony was a matter for cross-examination).

Although misconduct occurred, White's substantial rights to a fair trial were not prejudiced. The court's striking of Dr. Grinage's testimony and admonishing the jury not to consider it—before further proceedings in the jury's presence—were sufficient to remove any damaging effect under the specific facts of this case. Indeed, the record reveals that the district court fully recognized the potential impact of the prosecutor's action, carefully took the necessary time to research and consider the alternatives, and made a thoughtful choice the next morning. We certainly cannot say that no reasonable person would agree with the district court. See *State v. Snow*, 282 Kan. 323, 331, 144 P.3d 729 (2006). It did not abuse its discretion in refusing to declare a mistrial.

Issue 2: *The district court did not err in allowing a narrative response from witness Relph.*

Next, White asserts that the State "invaded the province of the jury by eliciting testimony from Officer Bruce Relph on the sequence of events in this case." Specifically, he argues that Relph testified to facts outside of his personal knowledge and inappropriately gave his opinion about them. White also asserts that the State violated his right to confrontation by allowing Relph to testify about statements made to him.

As mentioned, White argues that the *Tosh* standard applies because he asserts that the prosecutor committed misconduct in eliciting Relph's narrative response. This issue more accurately concerns the alleged erroneous admission of evidence rather than prosecutorial misconduct. White's argument is presumably framed in this fashion, however, because he failed to object at trial, a requirement for appellate review of evidentiary complaints but not prosecutorial misconduct. See *State v. Torres*, 280 Kan. 309, 319,

121 P.3d 429 (2005); K.S.A. 60-404. Contra *State v. Tosh,* 278 Kan. 83.

Even if we reach the merits of White's argument through *Tosh,* he loses. Relph testified about the sequence of events on the morning in question. Notably, the events were not controverted: as many as nine witnesses testified to them. Additionally, although White asserts that Relph provided his opinion about the underlying facts, White does not pinpoint where the alleged error occurred. Among other things, this purported prosecutorial misconduct cannot be considered gross and flagrant or indicative of ill will.

Finally, on the issue of confrontation, we observe that all of the fact witnesses were available for cross-examination. Consequently, we conclude that White's confrontation rights were not violated. See *State v. Snow,* 282 Kan. 323, 331-32, 144 P.3d 729 (2006) (issues related to the Confrontation Clause of the Sixth Amendment to the United States Constitution raise questions of law, requiring an appellate court to apply a de novo standard of review).

The district court did not err in allowing the testimony.

Issue 3: *The district court properly instructed the jury on the issue of mental disease or defect.*

Next, White argues that the district court improperly instructed the jury on the mental disease or defect defense. Based on this alleged error, White asserts that the jury did not determine whether he was guilty by reason of mental disease or defect.

The district court instructed the jury that it could find White "guilty of murder in the first degree, or murder in the second degree, or not guilty." The court specifically instructed the jury in Instruction No. 4 on White's defense of mental disease or defect:

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. Such evidence is to be considered only in determining whether the defendant had the state of mind required to commit the crime. You are instructed the defendant is not criminally responsible for his acts *if because of mental disease or defect the defendant lacked the intent to kill or premeditation.*" (Emphasis added.)

The jury was given a two-page verdict form. Pursuant to the jury instruction, page one provided that the jury could find White guilty

of murder in the first degree, guilty of murder in the second degree, or it could find him not guilty. Page two addressed the issue of mental disease or defect and stated in relevant part:

"Special question to the jury to be answered only if the jury finds the defendant not guilty.

"Question: Do you find the defendant not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required criminal intent?

"Answer: Yes _____ No _____."

White argues that the verdict form improperly instructed the jury that it only needed to consider mental disease or defect if it found White "not guilty." White, however, did not object to the instructions or verdict forms at trial. When asked about the verdict form, his counsel agreed: "We have no comments or problems with how you set it up, Your Honor. I think it appears appropriate."

Absent White's objection to the instruction, we review to determine whether the instruction is clearly erroneous. See K.S.A. 2006 Supp. 22-3414(3). " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.' [Citations omitted.]" *State v. Trotter*, 280 Kan. 800, 805, 127 P.3d 972 (2006).

The complained-of verdict form was taken directly from K.S.A. 22-3221, which provides:

"In any case in which the defense has offered substantial evidence of a mental disease or defect excluding the mental state required as an element of the offense charged, and the jury returns a verdict of 'not guilty,' the jury shall also answer a special question in the following form: 'Do you find the defendant not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required criminal intent?' "

Nevertheless, White asserts that the district court reversed the necessary inquiry:

"The verdict form improperly instructed the jury that they need only consider mental disease or defect if they find that Bobby was 'not guilty.' But if the jury found Bobby 'not guilty,' that would be the end of the analysis. It is only if the

jury found Mr. White was 'guilty' of committing the offense that they had to make the additional determination."

We disagree. The jury was instructed about mental disease and defect and how that could result in its determination of not guilty. The jury was also instructed to decide on guilt: if it found White not guilty, then it was instructed to designate whether it found him not guilty solely because of mental disease or defect, or not, *i.e.*, for some other, unspecified reason such as the prosecution failed to prove guilt beyond a reasonable doubt.

The district court did not err in taking its verdict form in part directly from the statute.

Issue 4: *The district court did not err in failing to instruct the jury on the lesser included offense of voluntary manslaughter.*

White finally argues that the district court erred in failing to instruct the jury on "imperfect defense-of-others" voluntary manslaughter, a lesser included offense of first-degree premeditated murder.

As a general rule concerning lesser included offenses:

" 'A trial court must instruct the jury on a lesser included offense "where there is some evidence which would reasonably justify a conviction" of the lesser offense. [Citation omitted.] "If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive." [Citation omitted.] "However, the duty to so instruct arises only where there is evidence supporting the lesser crime." [Citation omitted.] An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. [Citation omitted.]' " *State v. Boyd,* 281 Kan. 70, 93, 127 P.3d 998 (2006) (quoting *State v. Drennan,* 278 Kan. 704, 712-13, 101 P.3d 1218 [2004]).

K.S.A. 21-3403 defines voluntary manslaughter as "the intentional killing of a human being committed: . . . (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211 . . . ." In turn, K.S.A. 21-3211 provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to [such person] and [such person] reasonably believes that such conduct is neces-

sary to defend [such person] or another against such aggressor's imminent use of unlawful force."

This court discussed voluntary manslaughter in *State v. Ordway*, 261 Kan. 776, 786-87, 934 P.2d 94 (1997):

"[I]f the reasonable belief that force was necessary, which is the substance of 21-3211, is substituted for the defense-of-self-or-others as designated in 21-3403(b), the latter provides that voluntary manslaughter is an intentional killing upon a defendant's unreasonable but honest belief that he or she reasonably believed the use of force was necessary to defend others. In other words, the 21-3211 reasonableness of the belief that deadly force was justified is irrelevant because the 21-3403(b) belief is unreasonable. . . . [T]he reasonableness element of 21-3211 should not prevent a trial court's giving an instruction on the lesser included offense of voluntary manslaughter."

Here, White requested an instruction on imperfect defense-of-others voluntary manslaughter based upon his alleged honestly held but unreasonable belief that he needed to act to protect B.A.W. from Aaron's further abuse. The district court determined that White was precluded from receiving an instruction on voluntary manslaughter because he asserted the mental disease or defect defense, citing *Ordway*, 261 Kan. 776, and *State v. Baacke*, 261 Kan. 422, 932 P.2d 396 (1997).

In *Ordway*, the defendant was tried for killing his parents. His request for voluntary manslaughter instructions was denied. On appeal, Ordway argued that K.S.A. 21-3403(b) " 'include[d] intentional killing by a mentally ill defendant . . . whether or not their beliefs are founded in reality.' " 261 Kan. at 786-88. This court disagreed:

"There is no express indication in the [legislative history] note to 21-3403(b) that there was any contemplation that the subsection's unreasonable belief might be based on psychotic delusions (or some other form of mental illness). Nor does examination of the Kansas law cited . . . in the note indicate that application of subsection (b) to cases where a homicide defendant denied criminal responsibility due to mental illness was envisioned.

. . . .

". . . We conclude that K.S.A. 21-3403(b) has no application where a defendant raises the defense of insanity, and more specifically, the 'unreasonable but honest belief' necessary to support the 'imperfect right to self-defense manslaughter' cannot be based upon a psychotic delusion." 261 Kan. at 788-90.

This court stated a similar rationale in *Baacke*: "[I]n several similar cases, where defendants argued that they either possessed mental defects or were intoxicated, we have stated that defendants were not entitled to voluntary manslaughter instructions. [Citations omitted.]" 261 Kan. at 436.

White argues that *Ordway* and *Baacke* are not applicable because he was not attempting to use mental disease or defect as the basis for his unreasonable belief; rather, his counsel argued at the instructions conference that it was simply a proper *alternative* theory:

> "[Defense counsel:] I think that the jury is free to go back there immediately and go: 'You know what? We believe the State. There was nothing wrong with his thinking at that point in time. He was not incapable of forming intent.' I would like them, at that point, to at least have the opportunity of going: 'But we think that, you know, this was an unreasonable belief on his part. *It wasn't part of a mental disease or defect. It wasn't a psychosis, certainly, but it was unreasonable.'* And I think that those two arguments do not, necessarily, forestall each other." (Emphasis added.)

We agree with White. A court is required to instruct the jury on the " 'law applicable to defendant's *theories* for which there is supporting evidence.' " (Emphasis added.) *State v. Gonzalez*, 282 Kan. 73, 106, 145 P.3d 18 (2006). The incompatibility of theories does not necessarily prevent instruction on both: "When a party requests instruction on *alternative theories*, the district judge must consider the instructions separately and determine if the evidence could support a verdict on either ground." (Emphasis added.) *United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007) (citing *Griffin v. United States*, 502 U.S. 46, 59, 116 L. Ed. 2d 371, 112 S. Ct. 466 [1991]); see also *State v. Scobee*, 242 Kan. 421, 426, 748 P.2d 862 (1988) ("It is not inconceivable that a defendant might assert . . . alternative theories . . . and that the evidence could support either theory depending upon the jury's belief of the evidence.").

As White asserts, in *Ordway* and *Baacke* the defendants sought voluntary manslaughter instructions based upon mental disease or defect. Because White sought the imperfect defense-of-others manslaughter instruction as an alternative theory, those cases do

not control. The question remains, however, whether evidence exists supporting such an instruction. See *Boyd,* 281 Kan. at 93.

Relph testified that White told him Aaron was abusing B.A.W. Wendy Wilson, White's daughter, testified that Aaron continually followed B.A.W. around and gave him "wedgies" to the point that B.A.W. would scream. White's wife, Mary, testified that she was aware Aaron had ripped B.A.W.'s underwear while giving him a "wedgie"; she further stated that Aaron "jerked" B.A.W. around by the arm. According to Dr. Hutchinson, White told her that he had seen a picture of B.A.W. with the lower half of a man's nude male body: the man's penis was erect. She testified that White believed the male pictured was Aaron; he further believed that Aaron was sexually abusing B.A.W.

In short, evidence exists to support White's belief that B.A.W. had previously been abused. Nevertheless, the State argues there was no evidence of an imminent danger from Aaron to B.A.W. at the time of the shooting. The State reasons that an instruction on imperfect defense-of-others manslaughter therefore was not warranted.

The murder case of *State v. Hernandez,* 253 Kan. 705, 861 P.2d 814 (1993), provides some guidance. There, the district court gave a self-defense instruction but refused to instruct on defense of another because the "other" was not in imminent danger at the time of the shooting. The evidence revealed that the murder victim and his wife—the defendant's sister—were in the process of obtaining a divorce after considerable domestic fighting. Among other things, 3 days before the victim's death he had on two occasions yelled at his wife at their factory workplace and pushed her. The day before his death he was with her in her car yelling, banging his fists, and screaming that he would get his gun and blow her brains out.

The day of the victim's death, he told his wife at work that she had until 11 a.m. that morning to make up her mind and that he "hope[d] like hell" she would make the right decision. 253 Kan. at 707. Her brother, who worked at the same factory, was informed of these episodes. He then retrieved a gun from his car and invited the victim outside to talk. When they walked outside, the brother

asked the victim what was going on. When the victim replied that what he did to the sister was none of the brother's business and started forward, the brother shot him three times. He testified that several shots were to stop the victim from going after his sister, *e.g.*: "[T]he whole time my mind was on my sister. . . . I thought maybe he was gonna take me down and then go in [the adjoining factory] after my sister." 253 Kan. at 708-09.

Despite the victim's recent threats and assaults on his wife and despite the wife's presence in the adjoining factory at the time of the shooting, the *Hernandez* court found the danger was not imminent and affirmed the district court:

"Hernandez believed that Randy would kill his sister at 11:00 a.m. She was not present when Hernandez killed Randy. *The history of violence could not turn the killing into a situation of imminent danger. The trial court correctly determined that K.S.A. 21-3211 requires at least an imminently dangerous situation at the time of the killing before a defense-of-another instruction should be given.* Although the term imminent describes a broader time frame than immediate, the term imminent is not without limit. The danger must be near at hand. Under the facts in the case at bar, the only imminent danger was that created by Hernandez himself.

. . . .

"The statutory and case law concerning use of force by an aggressor also supports affirmance of the trial court's refusal to give the instruction. See K.S.A. 21-3214; *State v. Meyers,* 245 Kan. 471, 478, 781 P.2d 700 (1989). . . . *We conclude that a rational factfinder could not find that Hernandez acted in defense of his sister, Myra, at the time he shot Randy.*" (Emphasis added.) 253 Kan. at 712-133.

This court continues to adhere to the "imminent" requirement in self-defense. See *State v. Walters,* 284 Kan. 1, Syl. ¶ 3, 159 P.3d 174 (2007).

While instructive, *Hernandez* did not specifically concern *imperfect* defense of self or others as a basis for an instruction on voluntary manslaughter. Accordingly, we turn to *In re Christian S.,* 7 Cal. 4th 768, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (1994), and *Menendez v. Terhune,* 422 F.3d 1012 (9th Cir. 2005). In *In re Christian S.,* the California Supreme Court considered that state's doctrine of imperfect self-defense: like Kansas, a California defendant who kills with the genuine but unreasonable fear that he or she was in imminent danger of death or great bodily injury can

be found guilty of no more than manslaughter. In California, somewhat similar to Kansas, the trial court must give a requested instruction only when there is substantial evidence to support the defense. See *People v. Barton,* 12 Cal. 4th 186, 201 n.8, 47 Cal. Rptr. 2d 569, 906 P.2d 531 (1995) ("substantial evidence is evidence 'sufficient to deserve consideration by the jury' ").

The *In re Christian S.* court held that "[f]ear of future harm— no matter how great the fear and no matter how great the likelihood of the harm—will not suffice." 7 Cal. 4th at 783. It concluded that "the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense." 7 Cal. 4th at 783.

California's rule was applied to facts somewhat similar to those of the instant case in *Menendez,* 422 F.3d 1012. There, the Menendez brothers, who had been convicted in California state court for first-degree murder of their parents, filed petitions for writs of habeas corpus. Among other things, they argued that the trial court's rejection of their request for an imperfect self-defense jury instruction deprived them of due process. The trial court had determined that there was not substantial evidence of a belief that the danger was imminent. The California Court of Appeals had affirmed "because the defense presented insufficient evidence under California law of a belief in imminent peril." 422 F.3d at 1028.

The Ninth Circuit acknowledged that the Menendez' defense had presented evidence that their father had abused his two sons, that the mother acquiesced for most of their lives, and that there had been several confrontations between the father and his sons just days before the murders. It also acknowledged that "Erik testified that in the days leading up to the murders, he had some fear that, at some point, his parents would kill him—a fear that fluctuated in intensity during those final days." 422 F.3d at 1030.

But the *Menendez* court denied the brothers' request for writs of habeas corpus, explaining:

"Petitioners' focus on this evidence, however, is misplaced. Taken at face value, this background evidence served only to explain *why* the brothers might have had an unreasonable fear of their parents at the moment they killed them. At most, the evidence illustrated that Erik and Lyle feared that their parents had the ca-

pacity to and might, at some point, harm them. *Erik's testimony about his general fear in the days leading up to the murder does not provide any evidence that, at the moment he shotgunned his parents to death, he feared he was in imminent peril.*

. . . .

"Thus, the instruction was not warranted under California law. Had either Erik or Lyle presented evidence that, at the moment of the killings, they had an actual fear in the need to defend against *imminent* peril to life or great bodily injury, this evidence would have helped explain why they had that unreasonable fear. *Nonetheless, the fears leading up to the murders and the reasons why such fears might have existed simply are not the threshold issue for California's imperfect self defense instruction. In re Christian S.,* 7 Cal. 4th [768] at 783, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (1994). Consequently, the state court's decision was not error, let alone a violation of due process." (Emphasis added.) 422 F.3d at 1030.

Similarly, in the instant case, the evidence relied upon by White explains why he might have believed that B.A.W. had previously been abused or would be abused in the future. But White did not provide *any* evidence that he believed B.A.W. was in imminent danger at the time of the shooting. At that time, Aaron, the purported abuser, was not in the presence of B.A.W., the purported victim. Indeed, because White went to Aaron's Wal-Mart workplace, it would be quite difficult for him to present evidence that he honestly believed his 5-year-old grandson was there and that abuse was imminent.

We conclude that the district court did not err in failing to give an instruction on voluntary manslaughter based upon the imperfect defense of others. Simply put, a jury could not reasonably convict on this lesser included offense based upon the evidence presented. See *Boyd,* 281 Kan. at 93; see also *Hernandez,* 253 Kan. at 713 (because of no evidence of imminence, "we conclude that a rational factfinder could not find that Hernandez acted in defense of his sister, Myra, at the time he shot Randy"). We affirm the decision of the district court to deny the instruction, but for different reasons. See *State v. Kirtdoll,* 281 Kan. 1138, 1149, 136 P.3d 417 (2006) (judgment of trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision).

Affirmed.