No. 68,567

STATE OF KANSAS, *Appellee*, v. RUSSELL M. HERNANDEZ, *Appellant*.

(861 P.2d 814)

Opinion filed October 29, 1993.

*Mark A. Blehm*, of Russell, argued the cause, and *Peter R. Williams*, county attorney, was with him on the brief for the appellee.

*Reid T. Nelson*, assistant appellate defender, argued the cause and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

The opinion of the court was delivered by

.SIX, J.: The primary focus of this criminal case is on the propriety of the trial court's refusal to instruct on defense of another. Secondary issues relate to evidentiary rulings.

The standard of review on the refusal to instruct issue requires us to view the evidence in a light most favorable to the defendant,

Russell Hernandez, who requested the instruction. *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992). The standard of review on the evidentiary issues is abuse of discretion. *State v. Milo*, 249 Kan. 15, 26, 815 P.2d 519 (1991).

Hernandez appeals his convictions on one count of second-degree murder (K.S.A. 21-3402) and one count of unlawful use of a weapon (K.S.A. 21-4201[1][b]). The jury found that Hernandez had shot and killed his brother-in-law. Our jurisdiction is under K.S.A. 1992 Supp. 22-3601(b)(1) (direct appeal when defendant receives a maximum sentence of life imprisonment).

We find no error and affirm.

## Facts

Hernandez, his sister Myra Meis, and the victim Randy Meis (the husband of Myra) were all employed at the King of the Road trailer manufacturing plant in Russell. Randy and Myra were separated and in the process of obtaining a divorce. Myra testified that following the separation, Randy spoke with her often at work and came to her house every night. During these meetings they would fight. Myra related most of the incidents to Hernandez. On one occasion, Randy told Myra, "If you leave town, I'll go after you and I'm not scared of anybody; and I don't care how I get to you or how many innocent people I take down along the way, I will do it."

Myra began to sleep with a hammer in her bed a few weeks before the shooting. Randy confronted Myra at work three days before he was killed. He yelled at her about the divorce and shoved her into some boxes. Later that day, he followed her, yelling and screaming. As she took the first step up into the women's restroom, Randy pushed her. She hit the wall. He said, "You're history bitch. . . . You're fucking history." A friend located Hernandez and took him to Myra. She related what had just happened.

Hernandez was upset about Myra's marital problems. He spoke with his friend and co-worker, Lee Summers, the next day. According to Summers, Hernandez stated that he was terrified that Randy was going to kill Myra. Later in the day, Hernandez walked over to the table where co-workers were standing and said, "Whatever happens don't hate me." Summers stated that

Hernandez "was noticeably very very distraught, he was sweating profusely, a cold sweat, and he was almost on the verge of being hysterical, he was crying." Hernandez showed Summers a gun. Summers told him to give her the gun, which he did. Summers testified that Hernandez said he "couldn't do it," "couldn't kill him," and that she understood him to be referring to Randy. Summers locked the gun in her car. Later that day, Hernandez told Summers he would feel better if he had the gun "just in case" and promised to put it away unloaded. Summers returned the gun.

The day before the shooting, Myra and Randy met at their attorney's office to finish work on the divorce. The attorney had to reschedule the meeting for the next day. Randy followed Myra home. When Myra arrived, she stayed in the car and Randy entered on the passenger side. They discussed the divorce. According to Myra, Randy "was yelling at me banging his fists on the dash, shaking like I had never seen him shake before and his eyes were huge and he was spitting all over the place in the car." Myra told him she wished she were dead and Randy responded, "You want fucking dead? I'll go home and get my gun and come back and I'll take you in the garage and I will blow your fucking brains out and then my own and then nobody will have to worry about anything."

Fifteen minutes later Randy returned to Myra's house with their two children and announced that they were moving back in with Myra and that the divorce was off. At one point that evening, Randy left to go to the store and one of Myra's friends, Sheila Keil, stopped by. Keil left before Randy returned. Later that evening Keil and Hernandez came by to visit Myra. Myra testified that she told her brother about the threats Randy had made. Randy did not return that evening.

Myra saw Randy shortly before seven o'clock the next morning outside the building where they worked. According to Myra, Randy handed her a note and told her that she had until 11 o'clock that morning to make up her mind and that he "hope[d] like hell" she would make the right decision. He then walked away.

Around eight o'clock the same morning, Hernandez came over to Myra's work area and asked whether she had spoken with

Randy. She told him about the previous conversation. Myra indicated that Hernandez explained that he wanted to know if she had seen her husband because Randy had been back at his work area "going off . . . cussing and kicking shit around and just having, you know, throwing a fit back there." Myra testified that she told her brother she wished Randy would leave her alone. She said that Hernandez appeared shaky and pale, shook his head, and said that he too wished Randy would leave her alone.

Summers also testified that she had discussed with Hernandez the possibility of seeking police assistance for Myra. She explained that Hernandez said that Myra would not seek a restraining order because Randy told her he would kill her if she went to the police. The morning of the shooting, November 9, 1990, Hernandez informed Summers of his nightmares that Randy was going to kill Myra. Summers said Hernandez looked "distraught like he hadn't gotten any sleep at all."

Hernandez left the plant during the 9:05 morning break to retrieve the gun from his car. He hid the gun in the back of his pants. He testified that Randy had an advantage over him because Randy wore heavy rings and cowboy boots (which he had seen Randy use to beat someone up) and carried a knife at his side. Hernandez believed that the gun was "an equalizer."

Hernandez approached Randy and invited him outside to talk. Hernandez testified that he had wanted to find out what Randy meant when he said Myra had until 11 o'clock. He was scared and anticipated that Randy would get "pissed off." When they walked outside, Hernandez said, "What's on your mind, what's going on." Randy looked serious and mean, pointed to Hernandez and told him, "It ain't none of your fucking business what I do to your sister." Hernandez testified that "when [Randy] was saying that, he kind of . . . leaned forward and he put his hands, he had his hand up on his side and just when he started to kind of lean forward towards me I, I assumed he was coming at me and with his hands going up on his side, I just assumed he was going for his knife." Hernandez pulled out the gun. Randy came at him again; Hernandez pulled the trigger and told him that it was his business. Hernandez said that his intention was not to kill Randy and that he pulled the trigger "[t]o stop him, slow him down, to, my mind, the whole time my mind was on my

sister. . . . I thought maybe he was gonna take me down and then go in after my sister." His testimony continued:

"Q. Did you know whether you hit him the first shot?

"A. Well, when I pulled it the first time he kind of grabbed himself and he went a little bit, put his hand on the ground and he got back up and he didn't even look like he was in pain, he was just, looked like he was in a different state of mind.

"Q. Did he say anything?

"A. He just kind of looked at me with a cold look and he said, 'Now, I'm gonna kill you too,' and when he said that, when he said, 'I'm gonna kill you too,' I thought he meant as in also as in my sister, I knew it was on his mind. He had just admitted to me that he was gonna kill her.

"Q. Why was the second shot fired?

"A. Well, when I shot the first time I started shaking, I was shaking real bad. He kind of wanted to turn to run in and I shot again. When he started to turn to run in it was on my mind that he was going in after my sister.

"Q. Did you intend to kill him when you fired the second shot?

"A. No, sir, I just wanted to stop him, I just wanted to, I just wanted to stop him."

Hernandez fired a third shot. Randy ran inside the building. Hernandez testified that he thought Randy was going after his sister. Hernandez followed Randy inside and saw him start to fall. He assumed that Randy had tripped, so he shot him again "to stop him from going after my sister."

Monty Selensky, a co-worker, testified that he observed Hernandez ask Randy to go outside to talk. The two went outside and Selensky heard noise which he characterized as loud arguing. Selensky then heard a loud noise, which was repeated two more times. He believed the noise was a firecracker. He saw Randy run into the building with blood on his neck and his chest and flowing out of his mouth. Selensky testified that Randy fell into a refrigerator cabinet and then down onto his back. Hernandez ran through the door, went over to where Randy was located, and shot him two more times, saying, "There, it's over now." Another witness, Michael Howell, testified that Hernandez was shaking and appeared to be nervous when he entered the building and again shot Randy. Following the shooting, Howell heard Hernandez say, "He was going to kill my sister."

The physician who performed the autopsy testified that the cause of death was gunshot wounds. Three bullets had struck Randy from the front and one in the back.

Hernandez was transported to the Russell County Sheriff's Office by Undersheriff Tim Holmes. Holmes testified that while in the patrol car, Hernandez said, "I had to do it. She was my sister." At that time Holmes advised him of his *Miranda* rights.

During the cross-examination of Undersheriff Holmes at trial, defense counsel inquired whether Hernandez had spoken about the case during the time he was being transported to the sheriff's office. Counsel asked if the information was in addition to or inconsistent with a taped interview. Over defense counsel's objection, Holmes testified that Hernandez had stated, "The most a jury will convict me of is involuntary manslaughter when I tell them that, the jury, it was self-defense."

The State sought an order restricting the introduction of evidence as to the character, traits, personality, actions, or statements of Randy which were not contemporaneous with his death. The trial court limited this character testimony to specific instances which occurred within a period of six to eight months prior to the crime. Defense counsel took exception to the trial court's ruling.

The trial court gave the jury a self-defense instruction. Hernandez also requested a defense-of-another instruction. However, following extensive argument by counsel, the court decided over Hernandez's objection not to give a defense-of-another instruction.

### Defense of Another

Hernandez believes that most of the defense evidence indicated that he had killed Randy because he feared for the safety of Myra.

K.S.A. 21-3211 states:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

For a defense-of-another instruction to be available, the evidence, as a whole, must support an affirmative finding by a

rational factfinder under both prongs of the two-prong test set out in *State v. Rutter*, 252 Kan. 739, 746, 850 P.2d 899 (1993). The first prong is subjective: Did Hernandez sincerely believe it was necessary to kill Randy in order to defend Myra? The second is objective: Was his belief reasonable?

Hernandez states that his motion for a new trial on the instruction issue was denied because the trial court found that Myra was not in imminent danger at the time of the shooting. He explains that the trial court cited *State v. Stewart*, 243 Kan. 639, Syl. ¶ 4, 763 P.2d 572 (1988), in support of its decision that imminent danger is a key factor to be used in determining whether a defense-of-another instruction is required. Hernandez attempts to distinguish *Stewart* based on the fact that in *Stewart* we found that there was no imminent danger. According to Hernandez, in *Stewart*, the only evidence of the potential danger to the defendant was the victim's history of violence and abuse. Hernandez argues that, in the case at bar, he presented evidence which proved that Randy's threat to Myra would not have been stopped if the police had been contacted. Consequently, he contends that there was sufficient evidence from which a reasonable person could conclude that Myra was in imminent danger.

Hernandez also believes that Myra's physical location at the time of the shooting is not critical. He maintains that in *State v. Hundley*, 236 Kan. 461, 467-68, 693 P.2d 475 (1985), we reasoned that the word "immediate" in a self-defense instruction placed undue emphasis on the immediate actions of the deceased and that "imminent" was the more accurate term. Hernandez asserts that *Hundley* stands for the proposition that juries should have wide latitude in examining all the circumstances which surround a self-defense or defense-of-another situation. Jurors may then determine for themselves whether the impending danger was imminent. Hernandez believes there were facts which showed that Randy intended to kill Myra at 11:00 a.m. on the day he killed Randy.

The State acknowledges that in *State v. Hill*, 242 Kan. 68, 78, 744 P.2d 1228 (1987), we held that self-defense instructions may be justified solely on a defendant's own testimony. The State observes that *Stewart* requires that there be some evidence which shows the existence of imminent danger to another if the defense-

of-another instruction is warranted. In *Rutter*, 252 Kan. at 745, we observed, with reference to the *Hill* court's comment on a defendant's own testimony, that the elements of defense of another are statutory and there must be evidence of each of the elements of defense of another before a duty to instruct arises. The State explains that in *Rutter*, we determined that the evidence supported the fact that Rutter was the aggressor who had confronted the victim to settle a score. According to the State, the facts in the case at bar can be analyzed in a similar fashion. Randy was at a break table with co-workers at the time he was called outside by Hernandez and did not pose an imminent danger to anyone. The State explains that when Randy ran back inside the building after he was shot three times, he was bleeding profusely and could not have constituted a threat to anyone.

The State reasons that *State v. Rose*, 30 Kan. 501, 1 Pac. 817 (1883), also addresses the claim that Randy posed a threat to Myra later that morning. In *Rose*, we recognized that "[n]o one can attack and kill another because he may fear injury at some future time." 30 Kan. 501, Syl. ¶ 2. The State contends that under the *Stewart* analysis, the defense of another requires a showing of imminent danger close to the time of the killing. The State believes that Hernandez's lack of reasonableness is demonstrated by the fact that he ignored the advice of co-workers who encouraged him to seek non-violent options.

Hernandez accurately portrays the distinction between imminent and immediate discussed in *Hundley*. In *Hundley*, Carl, the victim, pounded a beer bottle on the night stand and threw a dollar bill toward a window, demanding that the defendant, his wife Betty, get him some cigarettes. Hundley testified that Carl had hit her with beer bottles many times in the past and that she pulled a gun from her purse because she felt threatened. When Carl saw the gun he laughed and said, "You are dead, bitch, now" As he reached for the beer bottle, Betty shut her eyes and fired the gun. 236 Kan. at 462. The unique history of Betty and Carl's relationship, in combination with the conflict at the time Carl was killed, supported the view that a jury could have found the fear of imminent danger to be reasonable.

However, the situation in the case at bar is not analogous. Hernandez believed that Randy would kill his sister at 11:00 a.m.

She was not present when Hernandez killed Randy. The history of violence could not turn the killing into a situation of imminent danger. The trial court correctly determined that K.S.A. 21-3211 requires at least an imminently dangerous situation at the time of the killing before a defense-of-another instruction should be given. Although the term imminent describes a broader time frame than immediate, the term imminent is not without limit. The danger must be near at hand. Under the facts in the case at bar, the only imminent danger was that created by Hernandez himself.

Our reasoning in *Stewart*, where the defendant killed her husband while he slept, is applicable to the case at bar:

"[O]ur legislature has not provided for capital punishment for even the most heinous crimes. We must, therefore, hold that when a battered woman kills her sleeping spouse when there is no imminent danger, the killing is not reasonably necessary and a self-defense instruction may not be given. To hold otherwise in this case would in effect allow the execution of the abuser for past or future acts and conduct." 243 Kan. at 648.

The statutory and case law concerning use of force by an aggressor also supports affirmance of the trial court's refusal to give the instruction. See K.S.A. 21-3214; *State v. Meyers*, 245 Kan. 471, 478, 781 P.2d 700 (1989). The exceptions under K.S.A. 21-3214(3) were not supported by the evidence. The facts demonstrate that Hernandez, who was armed, approached Randy, asked him to come outside, and then provoked the conflict. We have viewed the evidence in the light most favorable to Hernandez. We affirm the trial court's refusal to give the defense-of-another instruction. We conclude that a rational factfinder could not find that Hernandez acted in defense of his sister, Myra, at the time he shot Randy.

### Limitation of Evidence of the Abusive Relationship

Hernandez observes that the trial court limited the defense's evidence regarding the marriage relationship to the period six to eight months before Randy's .death. According to Hernandez, all evidence concerning Randy and Myra's past relationship is admissible. He cites *State v. Martin*, 234 Kan. 115, 120, 670 P.2d 1331 (1983), as supporting the rule that in self-defense cases, evidence of a victim's violent nature is admissible. Consequently,

Hernandez concludes that the same evidence should be admissible under a defense-of-another theory.

Hernandez asserts that the potential error in not admitting the evidence cannot be considered harmless. He maintains that the evidence admitted did not provide a complete view of Randy's violent nature. He asserts that his fear that Randy would commit an imminent violent act against Myra is more reasonable in light of evidence that Randy had hit Myra, thrown her across the room, and had been in numerous fights with other people. Hernandez believes the exclusion of this evidence denied him the right to present a defense. *Chambers v. Mississippi,* 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

The State replies that although past evidence of an abusive relationship is admissible, its admission is not without limit. The State suggests that at some point evidence becomes too remote to be relevant. The decision of where that point lies is left to the discretion of the trial court. The State believes that: (1) evidence concerning the relationship during six to eight months before the killing adequately explained the events leading up to the shooting, and (2) the older evidence proposed by Hernandez did not differ much from that which was admitted.

We have repeatedly observed that "[d]etermining whether evidence is too remote to be admissible rests within the sound discretion of the trial court. Mere lapse of time alone is not sufficient to deprive evidence of its probative value, but goes to the weight of the evidence to be considered by the jury." *State v. Tyler,* 251 Kan. 616, Syl. ¶ 5, 840 P.2d 413 (1992). See *State v. Ruebke,* 240 Kan. 493, 515, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

We have indicated that evidence which demonstrates a history of violence between the victim and the defendant is relevant to the determination of whether the defendant was in imminent danger. *State v. Hodges,* 239 Kan. 63, Syl. ¶ 5, 716 P.2d 563 (1986). Additionally, "[w]here self-defense is an issue in a homicide case, evidence of the violent nature or reputation of the victim is admissible." *State v. Martin,* 234 Kan. 115, Syl. ¶ 3. In *State v. Friberg,* 252 Kan. 141, 843 P.2d 218 (1992), Friberg

argued that the trial court erred in limiting his presentation of evidence concerning childhood beatings and other background information which he believed was necessary to his defense. 252 Kan. at 147. We concluded that "[s]ufficient evidence concerning the alleged childhood beatings was presented to allow the jury to consider the impact of such upon his claim of diminished capacity. There is no merit to the defendant's argument that he was not allowed to present a complete defense." 252 Kan. at 148. The marital discord during the six- to eight-month period before the killing was sufficient to present a complete defense and to provide a foundation for Hernandez's theory. We find no abuse of discretion in limiting the time frame.

## Hernandez's Statement

Hernandez contends that his statement, that the most the jury would convict him of was involuntary manslaughter, was not relevant. He asserts that the statement did not tend to prove any probative fact and also prejudiced the jury because it created the impression that he was trying to manipulate the legal system. He emphasizes that there is no rule which requires irrelevant evidence to be admitted simply because there was other relevant evidence within the same conversation.

He asserts that the statement was highly prejudicial, especially in light of the fact that the evidence concerning his state of mind at the time of the killing was inconclusive.

The State believes that Hernandez wanted the remainder of his statement admitted because prior to that conversation he had not indicated that the killing was done in self-defense. The State claims that Hernandez wanted the remarks admitted so that his self-defense statement on the witness stand would not seem contrived.

The trial court correctly determined that when Hernandez invited a portion of the statement into evidence, he waived any objection he might have had to the State's asking for the admission of the whole statement. See *State v. Hubbard,* 126 Kan. 129, Syl. ¶ 4, 266 Pac. 939 (1928) ("A defendant who by inquiry brings out a part of a statement of a witness is not in a position to complain of the action of the opposing party in calling for and bringing out the complete statement.").

"Under familiar rules, the opposing party is generally permitted to explore an entire transaction or conversation only partially explained. The common term for what appellant did is 'opening the door.' The scope of permissible examination under these circumstances is largely within the discretion of the trial court." *State v. Morris,* 208 Kan. 464, 467, 493 P.2d 274 (1972). When a statement is elicited by defense counsel, the defendant may not complain of that error on appeal. See *State v. Holley,* 238 Kan. 501, 507, 712 P.2d 1214 (1986). In the case at bar, defense counsel opened the door for the statement through his examination of Undersheriff Holmes. Hernandez cannot now successfully argue that the admission of the statement was error. During argument on the objection, the trial court informed defense counsel that he could elect to have the entire conversation excluded. Counsel replied: "I think I would rather go into it." Counsel made a calculated decision which indicated his preference that the whole conversation be admitted over none at all. We find no abuse of discretion.

Affirmed.