**2018 UT App 222**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARVIN JAY HUNT,
Appellant.

Opinion
No. 20160963-CA
Filed November 29, 2018

Fifth District Court, Cedar City Department
The Honorable Keith C. Barnes
No. 131500547

Willard R. Bishop and Todd Macfarlane,
Attorneys for Appellant

Sean D. Reyes and Jeffrey S. Gray,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE A. TOOMEY concurred.

HARRIS, Judge:

¶1     After a free-range stallion known as Confetti Magic aggressively charged him, rancher Marvin Jay Hunt corralled the horse and castrated him, along with several other stallions. One of Hunt's neighbors (Neighbor) claimed to own two of the stallions Hunt castrated that day, including Confetti Magic, and complained to local law enforcement. Hunt was charged with wanton destruction of livestock, and a jury found him guilty. Hunt now appeals his conviction, arguing that the statutory definition of "wanton destruction of livestock" is unconstitutionally vague, that the trial court erred by refusing to give a self-defense instruction, and that the jury's

determination of Confetti Magic's value was unsupported. We affirm.

## BACKGROUND

¶2 Hunt is a rancher based in western Iron County, Utah, who raises cattle and horses, largely on property he leases. Several years ago, he drilled a well on the leased property and created a "water point" for animals to use. Most of the property Hunt uses is unfenced, including the area containing the water point,[1] and animals are able to freely roam across the landscape. Indeed, many of the farmers and ranchers in the area—including Hunt—often turn their animals loose to graze freely on the land; in addition, the area is home to various herds of wild, abandoned, and runaway horses. As a result, many animals have access to Hunt's water point, including animals owned by other ranchers, and wild unowned horses.

¶3 Neighbor is one of the other residents of the area. When Neighbor first relocated to the area, he tended only small animals, such as dogs and chickens. At first, Hunt got along well with Neighbor and considered him to be a "good neighbor"; indeed, Hunt allowed Neighbor to use Hunt's water point for his small animals. The relationship began to sour, however, after Neighbor decided to keep horses. Hunt testified at trial that, for a while, Neighbor hauled hay in for his horses, which at that time were exclusively mares, and kept them in a small fenced enclosure. But at some point, Neighbor "opened the gate" and began allowing his horses to graze freely. Neighbor also informed Hunt that he had purchased a pinto Fox Trotter

---

1. Hunt testified that he built fences that could restrict access to the water point, but stated that he rarely closed the fences because he wanted his cattle to be able to freely access the water.

stallion—Confetti Magic—for $2,500, and that he intended to begin free-grazing that horse as well.

¶4     This news bothered Hunt, who had several mares of his own free-grazing in the area. Hunt told Neighbor he did not want any colts by those mares, and therefore he "really [didn't] want any studs turned loose" in the area. Neighbor began free-grazing Confetti Magic anyway, but subsequently agreed to find buyers for any colts produced by the union of Confetti Magic and any of Hunt's mares. For a period of time, Confetti Magic and Neighbor's other free-grazing horses would occasionally drink at Hunt's water point, while Hunt's free-grazing cattle would occasionally drink at a water tank on Neighbor's property. But Hunt perceived that Neighbor's water tank was less cared for or useful to the livestock than Hunt's water point, and Hunt began to be "irritated" because he had never given Neighbor permission to water his horses at Hunt's water point.

¶5     Confetti Magic's temperament further worsened the relationship between Neighbor and Hunt. While initially Hunt found Confetti Magic to be a "pretty decent young stud to be around" during the days when he was "pony size," as the stallion grew he began to get "real aggressive" and would "challenge" humans by "[coming] around with his ears back and his teeth bared and ready to get after you." Confetti Magic and the other horses also sometimes drove Hunt's cattle away from his water point and ate the feed Hunt put out for his cattle. Hunt eventually became so upset with these developments that he began catching and corralling Neighbor's horses whenever he needed to work with his cattle, and gave Neighbor a letter informing him that none of Neighbor's animals were welcome on Hunt's property or at Hunt's water point. But Hunt did not fence his land or close off his water point, and both Hunt and Neighbor continued free-grazing their animals. Neighbor's horses also continued to visit Hunt's water point.

¶6      Inevitably, Confetti Magic began siring colts with Hunt's and Neighbor's mares, and this upset Hunt still further. Among the colts produced by Confetti Magic was a "yellow Pinto stud that was also very "wild," in Hunt's estimation. Despite Neighbor's promise to find buyers for the unwanted colts, Hunt perceived that Neighbor was not making good faith efforts to do so, which resulted in "young studs" sired by Confetti Magic swelling the ranks of the horses free-grazing in the area.[2] At this point, Hunt began filing complaints with the sheriff's office, but believed those complaints were being ignored.

¶7      Subsequently, Hunt attempted to introduce a stallion of his own into the group of horses, telling Neighbor "if I got to have colts and you're not going to buy them from me, I'm going to take my own stud out there and raise colts that I want." Hunt testified that, in response, Neighbor raised his voice and warned Hunt that if he brought a stud out there, Neighbor would "make dog meat out of" it. Undeterred, Hunt introduced a stud of his own to the group of free-grazing horses, and observed his new stallion "closely [for] two or three weeks." Hunt noticed that his new stallion "drove . . . Confetti Magic off and took control of the horses." After a few weeks, however, Hunt's new stallion disappeared, only to be discovered at an animal shelter, badly beaten as if "with a chain . . . around the head and the ears and on the legs." After the stallion recovered, Hunt reintroduced him into the group of horses, but about two weeks later the stallion disappeared again, and this time was never found. After the stallion's second disappearance, Confetti Magic once again resumed his dominance of the horse herd.

---

2. Whether Confetti Magic bears sole responsibility or not, neither party appears to dispute that the number of horses free-grazing in the area grew significantly over time.

¶8     Soon thereafter, Hunt brought some new bulls to the area and attempted to drive them to his water point. Hunt was riding a "green broke stud" horse and was attempting to ensure that his bulls, which were "new to the country," would learn to drink at the water point before they "started wandering off." When he was still a quarter-mile from the water, however, Hunt noticed Confetti Magic running towards him with a "band of horses following him." Hunt observed that Confetti Magic's ears were laid back and that he was charging fast, and Hunt worried that the stallion intended to initiate a "stud fight" with his own horse. Because of this, Hunt raced his horse back to a horse trailer and penned it in, then stood by while Confetti Magic circled the trailer, apparently still agitated. Hunt testified that, at this point, he said to himself "that's it. I've had it." Hunt then corralled several horses, including Confetti Magic and the now-two-year-old pinto stud, and decided to castrate them. Hunt needed assistance, however, so he got in his truck to go pick up a friend to help him. After completing the three-mile round-trip journey, Hunt, his friend, and Hunt's son proceeded to castrate five stallions that Hunt described as "three of them mine, two of them [Neighbor's]."

¶9     Neighbor subsequently complained to the sheriff's office, and Hunt was eventually charged with wanton destruction of livestock. The State filed the case as a second-degree felony, based on its estimate of the value of Neighbor's castrated horses. Hunt attempted to defend the case on three general grounds. First, Hunt argued that the State could not demonstrate Neighbor's "ownership" of the horses without presenting evidence that there had been an official brand inspection. Second, Hunt argued that he had acted in self-defense. Finally, Hunt asserted that the State could not prove that any livestock had been damaged, because he believed that the horses were worth more as geldings than as stallions.

¶10     Prior to trial, Hunt attempted to develop his first defense by filing a motion to suppress any testimony regarding livestock ownership that did not come from an official state brand inspector, arguing that, under the Utah Livestock Brand and Anti-Theft Act, only a state brand inspector could establish ownership of livestock. The court denied this motion, ruling that the State could endeavor to prove ownership of the horses through conventional means, and that it was not required to do so by proving that there had been an official brand inspection. Hunt then moved to dismiss the case, arguing that, if ownership of livestock could be proven without an official brand inspection, then the wanton destruction of livestock statute was unconstitutionally vague. The court also denied this motion. At trial, however, Hunt ended up acknowledging that both Confetti Magic and the two-year-old pinto stallion belonged to Neighbor.

¶11     During trial, Hunt attempted to develop his other two defenses. He asked the court to instruct the jury regarding self-defense, arguing that he acted only in defense of himself and third parties. The court refused to give these instructions, concluding that a self-defense or defense-of-third-parties instruction would be inappropriate under the facts of this case, because by the time Hunt castrated the horses, they had been corralled and any imminent threat had passed. Also, during trial, after the State presented expert testimony that the two stallions were worth $14,000 less as geldings than as stallions, Hunt presented expert testimony of his own that the stallions were worthless originally and that the castration actually increased the value of both horses as work animals, causing them to appreciate in value by up to $1,500.

¶12     At the conclusion of the trial, the jury found Hunt guilty, but found that the stallions' value was between $500 and $1,500, resulting in a class A misdemeanor conviction rather than a second-degree felony conviction.

ISSUES AND STANDARDS OF REVIEW

¶13    Hunt now appeals, and asks us to consider three issues. First, Hunt contends that, if brand inspection is not required to prove ownership, then Utah's wanton destruction of livestock statute is unconstitutionally vague. Whether a statute is unconstitutionally vague is a question of law, which we review for correctness. *State v. Norris*, 2007 UT 6, ¶ 10, 152 P.3d 293. Relatedly, Hunt contends that the trial court erred when it determined that, under Utah's wanton destruction of livestock statute, the State could prove ownership of the horses through conventional means, rather than solely by presenting the testimony of a state livestock brand inspector. We review a trial court's interpretation of a statute for correctness. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863.

¶14    Second, Hunt contends that the trial court erred when it declined to instruct the jury on the subjects of self-defense or defense of a third party.[3] We review the court's refusal to issue

3. In his statement of issues on appeal, Hunt also asserts that the trial court erred by refusing to give additional jury instructions on various topics, including trespassing and estray horses. However, Hunt does not elaborate on these arguments, other than to briefly note that he wishes to challenge the trial court's decision to exclude those instructions. While failing to elaborate on arguments raised on appeal is not necessarily "an absolute bar to our review of an argument," an appellant who "fails to devote adequate attention to an argument . . . will almost certainly fail to carry [his] burden of persuasion." *State v. Gardner*, 2018 UT App 126, ¶ 22, 428 P.3d 58 (quotation simplified). Because Hunt has not clarified why he believes he was entitled to those instructions, he has not met that burden. *See State v. Sloan*, 2003 UT App 170, ¶ 13, 72 P.3d 138 (noting that we decline to address an issue when "the overall analysis of the

(continued…)

specific jury instructions for an abuse of discretion. *State v. Berriel*, 2013 UT 19, ¶ 8, 299 P.3d 1133.

¶15　Third, Hunt contends that there was insufficient evidence to support the jury's valuation of the stallions. "We will reverse a guilty verdict for insufficient evidence only when the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crimes of which he or she was convicted." *State v. Kennedy*, 2015 UT App 152, ¶ 19, 354 P.3d 775.

## ANALYSIS

### I

¶16　Hunt first contends that the wanton destruction of livestock statute used to convict him is unconstitutionally vague, as applied to the facts of this case, unless it is interpreted to incorporate a mandate that livestock ownership be established by an official state brand inspector.

¶17　The relevant statute provides that "a person is guilty of wanton destruction of livestock if that person . . . injures . . . livestock" and does so "intentionally or knowingly" and "without the permission of the owner." Utah Code Ann. § 76-6-111(2) (LexisNexis 2017). When interpreting a statute, our objective is "to give effect to the intent of the legislature in light of the purpose the act was meant to achieve." *Gutierrez v. Medley*,

---

(…continued)
issue is so lacking as to shift the burden of research and argument to the reviewing court" (quotation simplified)). We therefore have no reason to disturb the trial court's decisions regarding these other requested instructions.

972 P.2d 913, 915 (Utah 1998). To discern that intent, we look first to the statute's plain language, presuming that the legislature used each term "advisedly" and "according to its ordinary meaning." *State v. LeBeau*, 2014 UT 39, ¶ 26, 337 P.3d 254. If "the plain meaning of the statute can be discerned from its language," then we need not employ any "other interpretive tools." *LPI Services v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135.

¶18 The statute in question contains internal definitions for several of its terms, but does not include a definition for the word "owner." *See* Utah Code Ann. § 76-6-111(1)(b) (defining "livestock"); *see generally id.* §§ 76-6-101, 111 (nowhere defining "owner"). In the absence of any internal definition, Hunt asserts that the trial court should have imported language from the Utah Livestock Brand and Anti-Theft Act, which states that "[a] brand inspector . . . shall verify livestock ownership by conducting a brand inspection during daylight hours." *See* Utah Code Ann. § 4-24-303(1).[4] Hunt argues that livestock ownership cannot "be proven with sufficient certainty to satisfy probable cause or proof beyond a reasonable doubt . . . without a certificate of brand inspection." Accordingly, Hunt asserts that, if Utah Code section 76-6-111 is not interpreted to incorporate a requirement for brand inspection in order to demonstrate ownership, the statute is void for vagueness because it fails to clarify how ownership can be determined.

¶19 When a party raises an as-applied vagueness challenge, "[a] court should . . . examine the complainant's conduct before analyzing other hypothetical applications of the law." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495

---

4. This statute was initially numbered as Utah Code section 4-24-12, but was renumbered in 2017. Because the pertinent text of the statute has not changed, we cite to the current version of the statute for convenience.

(1982). "This is because a [person] who engages in some conduct that is clearly proscribed by statute cannot complain of the vagueness of the law as applied to the conduct of others." *State v. Tulley*, 2018 UT 35, ¶ 55 (quotation simplified). More broadly,

> to survive a vagueness challenge, a criminal statute must (1) define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement, and (2) establish minimal guidelines that sufficiently instruct law enforcement so as to avoid arbitrary and discriminatory enforcement.

*Id.* ¶ 54 (quotation simplified). As applied to the circumstances of this case, Hunt has failed to establish that the statute violates either element of this test.

¶20   As to the first element, we are not convinced that the statute's language is so vague that Hunt would have had no reason to suspect that castrating two horses he knew belonged to Neighbor would violate the statute. Hunt argues that the statute is vague if it does not require ownership to be proven by the testimony of a brand inspector because, absent a brand proving ownership, a person of ordinary intelligence would not know "whether castration of a feral, estray horse"[5] would be prohibited. But Hunt's own testimony undermines his argument. At trial, Hunt stated clearly that Confetti Magic and the pinto stallion he castrated belonged to Neighbor, and that he

---

5. An "estray" is defined, under Utah law, as "an unbranded sheep, cow, horse, mule, or ass found running at large," or as "a branded sheep, cow, horse, mule, or ass found running at large whose owner cannot be found after reasonable search." Utah Code Ann. § 4-25-102(1)(a).

knew this at the time he castrated them. Even assuming— without deciding—that the term "owner" might be vague when applied to a random estray horse that appears to be wild, an "ordinary person" in Hunt's position would certainly know that a statute prohibiting injuring animals without their owner's permission applied to horses that Hunt knew were owned by another person. The statute is therefore not vague as applied to Hunt's conduct. *See Tulley*, 2018 UT 35, ¶¶ 54–55.

¶21 Further, and in any event, we are not persuaded by Hunt's argument that livestock ownership can never be established in the absence of an official brand inspection. While the Utah Livestock Brand and Anti-Theft Act does require that owners brand most free-range livestock, *see* Utah Code Ann. § 4-24-205(1)(a), and does require a "certificate of brand inspection" before the slaughter or sale of livestock, *see id.* §§ 4-24-302(1), 304(1), neither that statute nor any other of which we are aware requires a brand inspector to verify ownership of livestock in other contexts in which ownership of livestock might be disputed, such as, for instance, civil litigation between individuals regarding ownership, or criminal cases like this one.

¶22 Moreover, not even the Utah Livestock Brand and Anti-Theft Act considers a brand inspection as the exclusive method of determining ownership of livestock. That statute certainly requires that brand inspectors "verify livestock ownership by conducting a brand inspection," but it also states that, if during that same inspection "no brand or mark appears on such livestock, the brand inspector may demand *evidence of ownership*." *See* Utah Code Ann. § 4-24-303(1), (4) (emphasis added). Therefore, the statute merely provides that ownership can be established through an official brand inspection; it stops well short of mandating that brand inspection is the only method for determining ownership of livestock.

¶23  Indeed, litigants often prove property ownership through a host of diverse methods, including through presentation of the testimony of the property's putative owner. *See State v. Buck*, 2009 UT App 2, ¶ 13, 200 P.3d 674 (noting that prosecutors proved that a victim owned a stolen laptop computer by presenting the victim's testimony that he owned the computer and the defendant did not); *see also State v. Norcutt*, 2006 UT App 269, ¶ 22, 139 P.3d 1066 (affirming a trial court's decision to allow the introduction of a "methamphetamine cookbook" into evidence because "evidence of [the defendant's] possession of the methamphetamine cookbook" would be probative of whether that defendant owned or controlled a particular methamphetamine lab). Here, the State elected to rely on similar methods, presenting Neighbor's and Hunt's testimony that Neighbor owned both Confetti Magic and the pinto stallion Hunt castrated. In this case, we see no legal infirmity with the State's decision to prove ownership by presenting Neighbor's testimony that he owned the horses, as well as Hunt's testimony acknowledging that fact.

¶24  Having concluded that the statute is sufficiently definite, under these circumstances, to have notified Hunt that his conduct was prohibited, we next examine whether the statute encouraged arbitrary or discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) (holding that the void for vagueness doctrine requires the legislature to "define the criminal offense . . . in a manner that does not encourage arbitrary and discriminatory enforcement," and that to avoid unconstitutional vagueness a statute must "establish minimum guidelines to govern law enforcement" (quotation simplified)).

¶25  Here, Hunt argues that, if brand inspection is not recognized as the only means of determining livestock ownership, then the statute is "subject to arbitrary and capricious case-by-case determination" because "there is no reasonably ascertainable standard of evidence" to prove

ownership beyond brand inspection. But this claim is again undermined by Hunt's own testimony that he was aware that the stallions belonged to Neighbor. "In an as applied challenge" we "focus on the particular conduct at hand and not on the possible conduct of hypothetical parties." *State v. Green*, 2004 UT 76, ¶ 51, 99 P.3d 820. Considering Hunt's particular conduct, we conclude that any "reasonable law enforcement official acquainted with [Hunt's] behavior" could determine that his actions might well violate the wanton destruction of livestock statute. *See Tulley*, 2018 UT 35, ¶ 73 (quotation simplified).

¶26 Accordingly, the trial court did not err in determining that ownership of livestock could be determined independent of an official brand inspection, and Hunt has failed to demonstrate that the wanton destruction of livestock statute is unconstitutionally vague as applied to him.

II

¶27 Hunt next contends that the trial court erred when it declined to instruct the jury about self-defense and defense of third parties. Hunt argues that he "was justified in exercising force against" Confetti Magic and the pinto stallion in order to defend himself and others, and that the trial court therefore abused its discretion when it refused to instruct the jury regarding Hunt's self-defense theory.

¶28 A defendant is generally entitled to instructions that support his theory of the case. *State v. Berriel*, 2013 UT 19, ¶ 10, 299 P.3d 1133. But this entitlement only applies if "the record evidence supports [the] defendant's theory." *Id*. In this case, Hunt asked that the jury be instructed that he had the right to defend himself or a third party "against another person's imminent use of unlawful force" by "using force . . . when and to the extent" that he reasonably believed it was necessary. *See* Utah Code Ann. § 76-2-402(1)(a) (LexisNexis 2017). Even

assuming, without deciding, that Confetti Magic and the pinto stallion each constituted "another person" for the purpose of the self-defense statute, Hunt's argument fails for the simple reason that there exists no evidence that—at the time he castrated the stallions—he was facing an *imminent* threat of unlawful force.

¶29 While Hunt testified that Confetti Magic charged him with the other horses close behind, he also testified that he fled the charge and subsequently managed to secure the horses inside his corral before electing to castrate the stallions. Had Hunt acted in his own defense in the moment when Confetti Magic was charging at him, the analysis may well be different. But on the facts presented here, by the time Hunt corralled the horses, any imminent threat had passed, and Hunt was no longer endangered by Confetti Magic's aggression. And the mere fact that Confetti Magic had a track record of aggressive behavior is not by itself sufficient to justify a self-defense instruction. Indeed, our supreme court has noted that "a history of violence or threats of future violence," standing alone, "are legally insufficient to create a situation of imminent danger" that would warrant a self-defense jury instruction. *Berriel*, 2013 UT 19, ¶ 20 (quotation simplified); *see also State v. Alires*, 2018 UT App 173, ¶ 27 (holding that a spouse's alleged history of domestic abuse, without more, does not create a "situation of imminent danger" sufficient to justify a self-defense instruction); *State v. Hernandez*, 861 P.2d 814, 820 (Kan. 1993) (holding that, even though "the term 'imminent' describes a broader time frame than immediate," the term is "not without limit," and an abusive spouse's "history of violence," by itself, cannot create "a situation of imminent danger" absent some indication that danger is "near at hand" (cited with approval in *Berriel*, 2013 UT 19, ¶ 20)). Because, at the time Hunt castrated the stallions, he was no longer subject to any imminent threat of harm, he was therefore not entitled to use force in self-defense. Accordingly, the trial court did not err by refusing to

instruct the jury about Hunt's self-defense and defense-of-others theories.

III

¶30    Finally, Hunt contends that the evidence was insufficient to support the jury's determination that the stallions had an aggregate value between $500 and $1,500 prior to their castration. Here, Hunt bases his argument on the fact that the jury was given competing assessments of value by his expert and the State's expert. Hunt's expert testified that the stallions had no cash value prior to their castration, but were worth up to $1,500 after their castration because they would be better work animals. The State's expert, in contrast, focused more on the animals' value as stud horses, and testified that the stallions were worth $16,000 prior to their castration, and were worth only $2,000 afterwards. Because the jury determined that the value of the stallions was between $500 and $1,500, Hunt posits that it must have accepted his expert's valuations and rejected the State's, and therefore asserts that the jury must have found that the stallions were valueless prior to his actions.

¶31    We disagree with Hunt's analysis of the jury's valuation. While the jury clearly did not completely accept the valuation provided by the State's expert, it does not follow that the jury completely rejected that valuation either. Certainly, the jury did not wholeheartedly accept the conclusions of Hunt's experts, or it would have acquitted him. Indeed, it is entirely possible that jurors made use of their entitlement to refrain from accepting any "expert's testimony as conclusive," and instead exercised their right to give each expert's testimony the "weight they choose, including no weight at all." *See Dixon v. Stewart*, 658 P.2d 591, 597 (Utah 1982). As has been noted in the analogous context of calculating damages in civil trials, "juries are generally allowed wide discretion in the assessment of damages," *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1084 (Utah 1985)

(quotation simplified), and we will "uphold [a jury's] calculation of damages so long as there is competent evidence to sustain it," *Cornia v. Wilcox*, 898 P.2d 1379, 1386 (Utah 1995). Here, the jury received expert testimony that the value of the stallions ranged between $0 and $16,000, and it selected a value within that range. Because it was entitled to afford whatever weight to the experts' damage valuations it wanted, and because the value it selected was within the range the experts presented, the jury's conclusions as to value were supported by competent evidence.

CONCLUSION

¶32    Hunt has not established that the wanton destruction of livestock statute is unconstitutionally vague as applied to his conduct, nor that, under Utah law, livestock ownership in criminal cases may only be proven through brand inspection. The trial court did not err when it permitted the State to prove ownership through the testimony of the putative owner and other conventional evidence. Further, the court did not err when it refused to give jury instructions regarding self-defense or defense of a third party. Finally, the evidence was sufficient to support the jury's valuation of the stallions Hunt castrated. Accordingly, we affirm Hunt's conviction.

———————