NOT DESIGNATED FOR PUBLICATION

No. 119,456

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

CHARLES WILLIAM MCCAIN,
*Appellee*.


MEMORANDUM OPINION

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed December 6, 2019. Reversed and remanded.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

No appearance by for appellee.


Before BRUNS, P.J., LEBEN, J., and BURGESS, S.J.


PER CURIAM: A group of teenagers filmed themselves attacking Charles McCain's son. Two months later, one of the attackers was among another group of teenagers down the street from McCain's house. McCain drove about a block away to confront the group and threatened one teenager with a pipe. After returning home, he then threatened another member of the group who drove by McCain's house. The district attorney charged him with two counts of aggravated assault.

Upon McCain's motion, the district court ruled that he was entitled to immunity under the Kansas self-defense immunity statute, K.S.A. 2018 Supp. 21-5231, because he was defending his son. But the statute requires a person to reasonably believe that a threat is imminent, and neither of the teens reasonably posed an imminent threat to McCain's son. So the district court should not have granted immunity to McCain. We therefore reverse the district court's judgment and send the case back for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2017, Dilen Dinkela and four other teenagers attacked Charles McCain's teenage son. One of the teenagers recorded the attack on his phone. The recording shows McCain's son talking with a group of teenagers when one of them comes from behind and slams him to the ground. The group then hits and kicks McCain's son until he is able to escape. He sustained a bruised rib, knots on his head, and a gash from a knife. Both Charles McCain and his son eventually saw the video.

The Johnson County District Attorney's Office charged Dinkela with battery. He signed a diversion agreement in August. It required that he have no contact with McCain's son.

The following month, McCain's son was standing in his driveway with two friends when he spotted Dinkela and three other teenagers down the street near a couple parked cars. Dinkela was in the next block, somewhere between 200 and 450 feet away from McCain's house. Dinkela testified that he could see McCain's son in the driveway. There is no evidence that Dinkela or any of the other teenagers made gestures towards McCain's son. Nor did the group advance towards McCain's house.

McCain's son told him that Dinkela was with a group of people down the street. According to McCain, he was scared that Dinkela and the other teenagers were there to

2

"jump" his son again. His son thought the same thing. McCain testified that he wanted to call the police, but his phone screen had cracked. He asked to use his son's phone, but his son refused because he did not want to involve the police. McCain then told his son and friends to go inside, but they wouldn't. Finally, McCain decided to confront the group of teenagers.

Although neither McCain nor his son knew it then, Dinkela and two other teenagers were there to help a friend who had run out of gas after locking the keys in his running car. Two teenagers, Brandon Long and Alex Fletcher, arrived with gas and a coat hanger to unlock the car. Dinkela arrived between 5 and 10 minutes later with more gas. Police later confirmed that the car was indeed out of gas.

Witnesses dispute what happened next.

The initial confrontation occurred when McCain drove down the street towards the group of teenagers. According to McCain, he got out of the truck with his tire-jack handle and told the group that they shouldn't come around his house. He testified that he was upset but didn't remember exactly what he said. He also testified that he pointed the tire-jack handle at Dinkela and said, "'Don't come down to my house and start trouble,'" to which Dinkela responded, "'Hit me. Hit me.'" McCain estimated that he was about 20 feet away from the group.

According to Dinkela and the other teenagers, when McCain stepped out of his truck to confront the group, he walked to the bed of his truck and grabbed a three-foot-long metal pipe. He then threatened Dinkela, saying that if Dinkela came around there again, he would bash Dinkela's head into the ground and kill him. Dinkela testified that McCain was about 15 feet away but very aggressive. Dinkela also said he was in fear for his life. Fletcher said that McCain was hitting the pipe in his hand and holding it in a batter's stance. Then McCain left.

3

The second confrontation occurred once McCain drove back to his house. According to McCain, about one minute after he had parked, a truck with two boys in it came from the group of teenagers and stopped in front of his driveway. McCain said neither of the boys said anything to him. But he testified that the passenger began to get out, so he repeatedly yelled "'[g]et out of here'" while brandishing the tire-jack handle. He also testified that he stayed in his driveway the entire time. McCain's son testified to this version of the events. He also said that, although he didn't know the two teenagers in the car, he had seen them with Dinkela "taunting me like they usually do."

Fletcher testified that he got in Long's truck to leave after McCain confronted their group. According to Fletcher, when they drove past McCain's house, McCain came out into the street with the metal pipe and forced them to stop. He then took a fake swing at Fletcher's arm, which was resting outside the passenger window. Fletcher testified that McCain was within five feet of the vehicle and was yelling for them to get out of the truck. Long and Fletcher then drove off.

Dinkela called the police. Officers arrived shortly after the second confrontation and eventually arrested McCain. The following day, the Johnson County District Attorney's Office charged McCain with two counts of aggravated assault, a severity-level-7 person felony. See K.S.A. 2018 Supp. 21-5412(b). One charge arose from McCain threatening Dinkela. The other arose from the events between Fletcher and McCain in front of McCain's house.

The facts we've summarized came from evidentiary hearings on a motion McCain filed for immunity from prosecution based on self-defense under K.S.A. 2018 Supp. 21-5231. McCain argued that he justifiably used force in defense of another person and his property. He asked the district court to determine whether the State had carried its burden to establish probable cause that his use of force was not statutorily justified. He also

4

asserted that the police and district attorney's office failed to follow the investigation and prosecution procedures described in K.S.A. 2018 Supp. 21-5231(b) and (c). As a remedy, McCain sought reimbursement of attorney fees and expenses from the Shawnee Police Department and the Johnson County District Attorney's Office.

The State argued that the evidence established probable cause that McCain's actions weren't statutorily justified. It emphasized that neither McCain nor a reasonable person would have believed that either Dinkela or Fletcher presented an *imminent* threat.

The district court first explained its factual findings in an oral ruling. Its primary finding was that Dinkela constituted a threat based on his presence near McCain's house. To reach that finding, the district court noted that (a) two months earlier, Dinkela and several others filmed themselves assaulting McCain's son, (b) Dinkela was on diversion as a result of that assault, (c) Dinkela knew that he was not supposed to be there or have contact with McCain's son, (d) Dinkela did not even need to be there, and (e) Dinkela did not leave when he saw McCain's son.

It also found that McCain was "upset, intimidated, [and] scared" for his son. And it found that McCain's sole purpose for approaching the group was to "tell Mr. Dinkela to get the heck out of there." In support of those findings, the district court reviewed the video of Dinkela assaulting McCain's son, which showed Dinkela "laughing and helping beat a defenseless kid." It noted that McCain had viewed it. And it noted that it would be natural for a "father [to] want to protect their child after that happens."

Based on its factual findings, the district court concluded that the State had not established that McCain's threat of force was not justified; thus, the State had not met its burden. Accordingly, the district court granted McCain's motion and dismissed the two aggravated-assault charges against him. It also assessed costs to the State. The district

5

court did not make any factual findings relating to the second aggravated-assault charge, when McCain allegedly took a fake swing at Fletcher in front of McCain's house.

The State has the right to appeal the dismissal of a criminal complaint under K.S.A. 2018 Supp. 22-3602(b)(1), and the State did so. The State filed a brief in our court; McCain did not. Even so, we must determine whether the State's arguments are well taken or whether the district court was correct.

ANALYSIS

The State contends that the district court erred when it found that McCain was immune from prosecution because it misinterpreted the applicable statutes and made unsupported factual findings. Although McCain did not file a brief on appeal, he argued in the district court that he was immune from prosecution for his use of force because he was defending his son against a threat.

We review a district court's decision to dismiss charges based on immunity under K.S.A. 2018 Supp. 21-5231 through a two-part standard: (1) We accept the district court's factual findings that are supported by substantial evidence (meaning evidence that a reasonable person would accept as sufficient to support the conclusion); and (2) with those factual findings in mind, we determine whether they are sufficient to support the district court's legal conclusions. *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017).

K.S.A. 2018 Supp. 21-5231 grants immunity from prosecution when a person uses force that is justified under K.S.A. 2018 Supp. 21-5222. Under that statute, a person's use of force is justified when the person reasonably believes that the force is necessary to defend a third person against the imminent use of unlawful force. K.S.A. 2018 Supp. 21-5222(a). This reasonable-belief standard has both subjective and objective elements, so

6

the person must actually believe that the force is necessary to defend against an imminent unlawful force *and* that belief must be reasonable. *State v. Salary*, 301 Kan. 586, 593-94, 343 P.3d 1165 (2015).

But the statutory scheme does not describe when unlawful force is "imminent." Our Supreme Court has said that an imminent "danger must be near at hand." *State v. Hernandez*, 253 Kan. 705, 713, 861 P.2d 814 (1993). Past harms generally do not meet that standard. *State v. White*, 284 Kan. 333, 352-53, 161 P.3d 208 (2007) (finding danger not imminent based on prior sexual abuse). Nor does the threat of future harm. *Hernandez*, 253 Kan. at 712-13 (finding danger not imminent when husband told wife he would kill her at factory at 11 a.m. but wife's brother shot husband outside factory at 9:05 a.m.).

When a defendant moves for immunity under K.S.A. 2018 Supp. 21-5231, the district court holds an evidentiary hearing. *Hardy*, 305 Kan. at 1011-12. At that hearing, the burden is on the State to establish probable cause that the defendant's use of force was not statutorily justified and, thus, that immunity is not appropriate. 305 Kan. at 1011. Establishing probable cause requires sufficient evidence to cause "a person of 'ordinary prudence and caution to conscientiously entertain a reasonable belief'" that the force was not justified under the statute. *State v. Ultreras*, 296 Kan. 828, 846, 295 P.3d 1020 (2013).

Here, the district court granted McCain's motion seeking immunity under K.S.A. 2018 Supp. 21-5231 and dismissed the two aggravated-assault charges against him. The State first argues that substantial evidence does not support the district court's factual findings. It then asserts that, as a matter of law, the district court erred when it ruled that the State had failed to establish probable cause that McCain's use of force wasn't justified.

7

It's difficult to review the district court's factual findings because it made so few of them. The key findings were that Dinkela should not have been there and that his presence was threatening to McCain's son. The court also found that McCain's sole purpose in confronting the teens was to get them to leave. But it didn't make *any* factual findings about the second confrontation. Even without more findings from the district court, though, we are able to resolve the State's appeal because under any reasonable view of the evidence presented, the district court erred as a matter of law.

To find that the self-defense immunity statute protected McCain, the district court had to conclude that McCain's use of force *was* justified. Because the statute requires both a subjective and an objective element, the district court must have determined (1) that McCain actually believed that first Dinkela and then Fletcher constituted an imminent threat to his son and (2) that McCain's belief was objectively reasonable. But even if McCain actually believed that either Dinkela or Fletcher posed an imminent threat to his son, that belief was not objectively reasonable.

Danger is imminent when it is near at hand. But here, the teens were a significant distance from the house when McCain threatened Dinkela. The teens didn't move towards the house, didn't communicate with or threaten McCain's son, and didn't brandish a weapon. And nearly two months had passed since Dinkela helped beat up McCain's son. Then during the second confrontation, although the teens were in the road outside McCain's house, neither of them made threats or exited their truck. Although McCain said one of them was starting to get out of the truck, he said that the boy never put a foot on the ground, didn't say anything, and was about 10 feet away from him. McCain didn't say that either boy had a weapon. On these facts, a person of ordinary caution would at least entertain a reasonable belief that no threat was imminent and therefore that the use of force under this statute wasn't justified in either of these confrontations. See *Ultreras*, 296 Kan. at 846. So we must reverse the district court's judgment.

8

Before closing our opinion, we will briefly address a second issue raised by the State on appeal. In his motion seeking immunity, McCain asked the district court to assess his attorney fees and expenses to the State because he said that the State had failed to follow statutory procedures in its investigation. The district court agreed and ordered the State to pay his attorney fees. On appeal, the State argues that the district court lacked the authority to order these costs and that, even if it had the authority, it erred in ordering them here.

Because we have separately decided to reverse the district court's immunity judgment, the award of fees necessarily goes away—it was premised on the immunity ruling. We have our doubts about the award of attorney fees in an immunity proceeding under K.S.A. 2018 Supp. 21-5231. Ordinarily, Kansas courts have the authority to award attorney fees and litigation expenses to a prevailing party only if a specific statutory provision or agreement between the parties authorizes it. *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 488, 173 P.3d 642 (2007). And K.S.A. 2018 Supp. 21-5231 makes no mention of attorney-fee awards. But only one side has filed a brief in this appeal, and whether attorney fees might be awarded in this setting presents an important question. We need not decide it here since the award made to McCain—premised on his immunity—necessarily goes away when his immunity claim under K.S.A. 2018 Supp. 21-5231 is denied.

We reverse the district court's judgment and remand the case to the district court for further proceedings.